[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Whitaker*, Slip Opinion No. 2022-Ohio-2840.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-2840

THE STATE OF OHIO, APPELLEE, *v*. WHITAKER, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Whitaker*, Slip Opinion No. 2022-Ohio-2840.]

*Criminal law—Aggravated murder—Death penalty—A house not maintained as a permanent or temporary dwelling is not an occupied structure for purposes of conviction of aggravated burglary—R.C. 2911.11—R.C. 2909.01(C)(1)—Aggravated-burglary conviction and finding of guilt on count of felony murder during an aggravated burglary vacated for lack of sufficient evidence—Judgment on death-penalty specifications for felony murder predicated on aggravated burglary reversed and specification dismissed—Consideration of aggravated burglary as an aggravating circumstance during mitigation phase constituted harmless error because other death-penalty specifications remained valid and other aggravating circumstances outweighed mitigating factors beyond a reasonable doubt— Judgment affirmed in part, vacated in part, and reversed in part and cause remanded—Death sentence affirmed.*

(No. 2019-1482—Submitted October 5, 2021—Decided August 18, 2022.)

APPEAL from the Court of Common Pleas of Cuyahoga County,
No. CR-17-614021.

_____

**FISCHER, J.**

{¶ 1} This is an appeal of right from an aggravated-murder conviction and death sentence. A Cuyahoga County jury found appellant, Christopher Whitaker, guilty of the aggravated murder of 14-year-old A.D. and of the three accompanying death-penalty specifications: (1) committing the aggravated murder during an aggravated rape, (2) committing the aggravated murder during an aggravated burglary, and (3) committing the aggravated murder during a kidnapping. The jury recommended a sentence of death and the trial court sentenced Whitaker accordingly. We vacate Whitaker's conviction for aggravated burglary and the finding of guilt on Count 3 (felony murder during an aggravated burglary), and we dismiss the death-penalty specifications predicated on aggravated burglary. We affirm Whitaker's remaining convictions and his death sentence.

## I. TRIAL EVIDENCE

### A. A.D. fails to arrive at school

{¶ 2} In January 2017, 14-year-old A.D. was a seventh-grade student at E Prep School, located at East 93d Street and Union Avenue in Cleveland. To get to school, A.D. took a public bus from home, changed buses at Kinsman Road and East 93d Street, and took a second bus to school. On some mornings, A.D.'s friend J.R. met her on East 93d Street and made sure she got on the second bus.

{¶ 3} On January 26, A.D. boarded the bus near her home to travel to school. J.R. was late and did not see A.D. that morning.

{¶ 4} Donnesha Cooper, A.D.'s mother, called the school when A.D. failed to arrive home after school. A school official told Cooper that A.D. had never arrived at school that day. Cooper then called the police and reported A.D. missing.

School officials scoured the area looking for A.D. The next day, the area was canvassed and fliers were distributed with her picture.

### B. A.D.'s disappearance

{¶ 5} On January 26, Kenneth Chambers was at the bus stop on 93d Street and Harris Avenue. At approximately 6:55 a.m., Chambers saw an unknown man grab and take A.D. Chambers did not call the police, because he was unsure whether they were related.

{¶ 6} FBI agents obtained surveillance footage from Regional Transit Authority ("RTA") buses and from other locations, and FBI analysts developed a timeline for A.D.'s disappearance on the morning of January 26. The video showed that A.D. got off the bus at East 93d Street and Kinsman Road that morning. About 6:50 a.m., A.D. boarded a southbound bus on East 93d Street that was headed toward her school. A.D. requested a stop shortly thereafter and got off near Bessemer Avenue. A.D. walked north on 93d Street at the same time that a man was walking south. A.D. crossed the street, and the man turned and started walking north. At 7:13 a.m., A.D. neared the man but stepped away from him. An analyst testified that at 7:19 a.m., two people, believed to be the man and A.D., walked across a vacant lot toward Fuller Avenue.

{¶ 7} A Cleveland police detective, who had also looked at video from the surrounding area, testified that the same man had walked around East 93d Street and Fuller Avenue earlier that morning, at 4:26, 5:01, and 6:30 a.m. The man on that video was later identified as Whitaker.

### C. Police find A.D.'s body in a vacant house

{¶ 8} On January 29, police found A.D.'s body inside a vacant house on Fuller Avenue.

{¶ 9} Upon entering the house, police found a trail of blood leading from the dining room into an adjoining bedroom. Officers kicked open the bedroom door and found A.D.'s nude body on the floor. They found a drill, box cutter,

screwdriver, hammer, and a nut driver at the start of the bloody trail in the dining room. Several of the tools had bloodstains on them. Bloody boot prints were found in the dining room and living room and on the bedroom floor.

{¶ 10} Police recovered a torn sweater, a training bra, a shoe, and a torn condom wrapper in the living room. However, A.D.'s backpack, earbuds, winter coat, and other clothing were never recovered. No empty alcohol containers or drug paraphernalia were found inside the house.

*D. Whitaker is seen after the murder, and he tries to leave the area*

{¶ 11} During their investigation, police learned that around 10:00 a.m. on January 26, the day that A.D. disappeared, Whitaker went to Golgatha Missionary Baptist Church and asked the assistant pastor, David Brewton, whether he needed help unloading the truck for the church's food pantry. Whitaker worked for two hours. Brewton testified that while they were unloading the truck, Whitaker said, "I'm not working and * * * I'm down on my luck and * * * I had some problems with my woman." But Brewton stated that he did not notice anything unusual about Whitaker's appearance and that nothing indicated that Whitaker was intoxicated or on drugs.

{¶ 12} An acquaintance of Whitaker's, Alton Sanders, testified that on January 28, Whitaker told Sanders, "I got to get out of here. * * * I pay somebody $20 to take me out of here." Sanders replied, "I don't have a car."

*E. Whitaker is arrested and questioning begins*

{¶ 13} On February 2, 2017, police arrested Whitaker after his DNA was identified from samples collected from A.D. After Whitaker waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Cleveland police detectives conducted a videotaped interview of him.

### 1. Whitaker's first interview

#### a. Initial denials

{¶ 14} Whitaker told the detectives that he was on Fuller Avenue maybe on the previous Monday or Tuesday (January 23 or 24) to drywall a house. He stated that he spent Wednesday night on 84th Street and woke up between 10:30 and 11:00 a.m. on Thursday (the day A.D. was killed).

{¶ 15} Whitaker said that he did not know A.D. or what had happened to her. He claimed that he first heard about the incident when he saw a flier being passed out about her disappearance. He recognized the house on Fuller Avenue where A.D.'s body was found because he and some of his friends had taken the water heater, furnace, and scrap metal from the basement. Whitaker stated initially that he had never been in any other part of the house.

#### b. Confronted with DNA evidence

{¶ 16} Police then informed Whitaker that his DNA was found upstairs in the house. Whitaker replied that he had gone into the kitchen to see whether the counter tops were still there. He maintained that he did not go further into the house. After being told that his DNA was found in the dining room, Whitaker said that he and his friends had walked around the house to see whether there was a cast-iron tub.

{¶ 17} Police then asked Whitaker how his DNA and semen were found inside A.D. Whitaker stated that on Wednesday night, he rode a bike to the area looking to get high. He met two men and they entered the Fuller Avenue house. He did not know how A.D. got there, but she was naked when he arrived. Whitaker denied hurting A.D. and said he just masturbated because he did not fit inside her. Whitaker then rode his bike home and arrived there at 8:15 or 8:20 a.m. Whitaker claimed that he did not know how young A.D. was until he saw the fliers.

### c. Whitaker admits murdering A.D.

{¶ 18} Police later informed Whitaker that his bloody boot prints were the only boot prints found in the house. Whitaker then changed his story and said that he and the other men met A.D. on East 93d Street. He said that A.D. kept walking back and forth while Whitaker was at the bus stop. At first, he did not know whether A.D. was a streetwalker. Whitaker stated that he asked A.D. "what was going on" and whether she wanted to go with them. Whitaker said that he was about to get high. According to Whitaker, the men walked across the field toward the Fuller Avenue house and A.D. followed them. Whitaker and A.D. went into the house, but the others remained outside.

{¶ 19} Whitaker stated that he got high and that A.D. asked what it made him feel like. He said it made him horny. Whitaker then asked A.D. if they could get naked and do something. He stated that A.D. undressed herself and that after she was naked, he began to rub up against her and she never told him to stop. According to Whitaker, "things * * * got out of hand." A.D. pushed and hit him. Whitaker reacted by punching her. He said that after that, "it was like a blur and * * * [he] almost blacked out" but "[e]verything was done by the time [his] mind cleared up." Unsure whether A.D. was still alive, Whitaker dragged her to the closet and ran out of the house.

{¶ 20} Whitaker said that he did not remember whether he had used any tools on A.D. Whitaker also claimed that none of this would have happened if he had been sober and in the right state of mind.

{¶ 21} Whitaker called his friend Deb from the interview room following the end of questioning. Whitaker told her that he did not do it. He said the police picked him up because he was scrapping at the Fuller Avenue house and his fingerprints were there.

**2. Whitaker's second interview**

**{¶ 22}** On February 3, Whitaker requested to speak to detectives again. Whitaker first repeated his earlier claims that other people were with him inside the Fuller Avenue house. Police showed Whitaker evidence that an impression from only one type of boot was found inside the house. Questioning then shifted to Whitaker's actions inside the house. Whitaker stated that A.D. panicked and that caused him to panic and "then that's when all hell broke loose." When asked about A.D.'s torn clothing, Whitaker stated that he probably tried to "yank it off of her" to hide all the evidence. He believed A.D. was still alive when he ripped off her clothing.

*F. Whitaker's phone calls from jail*

**{¶ 23}** Whitaker made several monitored phone calls from jail while awaiting trial. On February 16, 2017, Whitaker called a woman known as Martha and said, "[I]f anybody asks you that night when I got arrested, was we drinking and getting high, just say yeah." Martha replied, "But we wouldn't." Whitaker then said, "You just say okay or just do it." He added, "Anything that might have been said that first night I got arrested would have to be thrown out. They never tested me or anything for drugs, or alcohol."

**{¶ 24}** On March 3, 2017, Whitaker told an unidentified woman, "This is like pulling the rabbit out of the haystack. * * * I might have to use you as one of my witnesses or somebody as being in the house and getting high and having sex with me. * * * I'm talking about at the Fuller house."

**{¶ 25}** On April 6, 2017, Whitaker told an unidentified woman, "I need you to call and probably one more person to call. Call the lawyer and tell him you all don't want to be on TV, but you was over there and you had sex with [unintelligible] in the house." He instructed her to say it was "January 23 or 24." Whitaker said that he would decide who that other person was going to be. He concluded, "They

will know I was in that house and if my DNA is in there, it was because I did have somebody else in there and we had sex."

*G. DNA evidence*

{¶ 26} Jeffrey Oblock, a DNA analyst with the Cuyahoga County Regional Sciences Laboratory, conducted DNA tests on swabs obtained from A.D. The major DNA profile from seminal material found in A.D.'s vagina and on her labia matched Whitaker's DNA profile. According to Oblock, the "probability of selecting an unrelated individual at random from a population as a possible contributor to that mixture is approximately 1 in 958 trillion in Caucasians, one in 67 trillion in African Americans and one in 571 trillion in Hispanics."

{¶ 27} Oblock also determined that A.D.'s DNA profile was on swabs obtained from stains on the shaft and handle of the nut driver, the trigger and top surface of the drill, the blade of the utility knife, and the handle of the putty knife and from apparent bloodstains on the blade and handle of the utility knife and the blade and hilt of the putty knife. Oblock stated that a "match between [the grip of the drill] and A.D. is 10.9 octillion times more probable than a coincidental match to an unrelated African-American person, 499 octillion times more probable than a coincidental match to an unrelated Caucasian person, and 45.3 octillion times more probable than a coincidental match to an unrelated Hispanic person."

*H. Boot-print evidence*

{¶ 28} Lisa Przepyszny, a forensic scientist at the Cuyahoga County Regional Forensic Science Lab, testified that all the boot prints in the crime-scene photos and two imprints in plaster at the scene had a similar tread design and appeared to be from the same boot. Przepyszny testified that a pair of Ozark Trail boots that police had seized from the house where Whitaker stayed on East 84th Street had a similar tread pattern to the boot prints in the blood found at the Fuller Avenue house. She compared the left Ozark boot to bloody impressions on the plaster taken from the crime scene and concluded that the "comparison revealed

class characteristics and several unique wear characteristics" to show a level II association. (According to Przepszny's forensic report, which was admitted into evidence, a level II association is "[a]n association in which the known sample and the questioned sample share the same physical properties and/or chemical composition. Also, the known sample and the questioned sample display unique or atypical characteristics that would be expected to be readily found within the population of this evidence type.")

*I. Autopsy results*

{¶ 29} Dr. David Dolinak, a Cuyahoga County deputy medical examiner, conducted A.D.'s autopsy and concluded that she died from multiple injuries. She had suffered eight puncture wounds of various depths to her face and head. One puncture wound through her right eyelid forced her eye partly from its socket, fractured the bone above and behind her eye, and entered the right side of her brain. Another puncture wound on the right side of her face displayed a pattern that was consistent with "a corded drill with a sprocket at the end of it." And another puncture wound went through the right ear and skull and into her brain.

{¶ 30} Dr. Dolinak also identified a pattern injury on A.D.'s face that was consistent with the metal teeth marks on a power drill, a tear to her scalp that could have been caused by a hammer or a wrench, and a puncture wound on the top of her head that was consistent with a Phillips-head screwdriver. The pattern of another wound by her left ear "might be an imprint to some extent from the bottom of the boots" and the force from a boot on the side of her face may have fractured her jawbone. A puncture wound to A.D.'s breastbone and a cluster of puncture wounds to the back of her body were consistent with a Phillips-head screwdriver. Dr. Dolinak noted that the loss of a large amount of blood indicated that A.D.'s carotid artery had been cut and further testified that there had been many injuries to her neck. Dr. Dolinak stated that A.D. was still alive when the majority of the injuries were inflicted.

## II. PROCEDURAL HISTORY

{¶ 31} Whitaker was charged with ten felony counts. In Count 1, he was charged with the aggravated murder of A.D. while committing rape. In Count 2, Whitaker was charged with the aggravated murder of A.D. while committing kidnapping. In Count 3, he was charged with committing the aggravated murder of A.D. while committing aggravated burglary. And in Count 4, he was charged with the aggravated murder of A.D. with prior calculation and design.

{¶ 32} Each of the aggravated-murder counts included three death-penalty specifications under R.C. 2929.04(A)(7): (1) committing or attempting to commit rape as the principal offender, "or, if not the principal offender, committ[ing] the aggravated murder with prior calculation and design," (2) committing or attempting to commit kidnapping as the principal offender, "or, if not the principal offender, committ[ing] the aggravated murder with prior calculation and design," and (3) committing or attempting to commit aggravated burglary as the principal offender, "or, if not the principal offender, commit[ing] the aggravated murder with prior calculation and design."

{¶ 33} In Count 5, Whitaker was charged with rape. Count 6 charged him with kidnapping for the purpose of terrorizing or inflicting serious physical harm. Count 7 charged him with kidnapping for the purpose of engaging in sexual activity against A.D.'s will. Counts 6 and 7 included a specification under R.C. 2941.147, alleging that he had committed the offenses with a sexual motivation. Counts 5, 6, and 7 included a specification alleging that Whitaker is a sexually violent predator under R.C. 2941.148. Count 8 charged Whitaker with aggravated burglary. All four counts included a notice-of-prior-conviction specification, R.C. 2929.13(F)(6), and a repeat-violent-offender specification, R.C. 2941.149(A).

{¶ 34} In Count 9, Whitaker was charged with tampering with evidence, and Count 10 charged him with gross abuse of a corpse.

10

{¶ 35} Whitaker pled not guilty to all the charges. He elected to bifurcate the notice-of-prior-conviction specifications, the repeat-violent-offender specifications, and the sexually-violent-predator specifications from the remaining charges. He stipulated to his prior convictions. A jury found Whitaker guilty of the remaining counts and specifications. The sexually-violent-predator specifications were later dismissed. And the trial court chose not to impose any sentence for the repeat-violent-offender specifications.

{¶ 36} During mitigation, the state elected to proceed on Count 4. The jury recommended a death sentence, and the trial court sentenced Whitaker accordingly. The trial court sentenced Whitaker to an aggregate prison term of 48 years to run consecutively on the noncapital offenses.

{¶ 37} Whitaker appeals his convictions and sentence and raises 21 propositions of law. We will address these issues in the approximate order that they arose during the proceedings.

### III. ISSUES ON APPEAL

#### A. *Capital specifications*

{¶ 38} In proposition of law No. XVII, Whitaker argues that the capital indictment was insufficient because it did not include a grand-jury determination that there was probable cause to find that the aggravating circumstances outweighed the mitigating factors. He contends that this probable-cause finding must be alleged in the indictment to comply with Article I, Sections 9, 10, and 16 of the Ohio Constitution and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

{¶ 39} Because Whitaker failed to object before trial to this alleged deficiency, he has forfeited this claim absent plain error. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 46; Crim.R. 12(C)(2) (objections to defect in indictment must be raised before trial). To prevail, Whitaker must show that an error occurred, that the error was plain (i.e., the error was an "obvious"

defect in the trial proceedings), and that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 40} Whitaker argues that a capital indictment must include all elements that allow for the imposition of the death penalty. Whitaker invokes *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in support of his argument that the fact of the aggravating circumstances outweighing the mitigating factors is an element of the aggravated-murder offense, which requires a grand-jury finding of probable cause.

{¶ 41} In *Apprendi,* the United States Supreme Court held that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" of the charged offense that must be submitted to a jury. *Id.* at 494. *Ring* applied the *Apprendi* rule to invalidate Arizona's death-penalty scheme, which had allowed the imposition of the death penalty based solely on judicial fact-finding of the aggravating factors. *Ring* at 597, 603-609.

{¶ 42} We previously rejected the argument that Whitaker makes here, holding that "*Apprendi* and *Ring* are rooted in the Sixth Amendment right to a jury trial," *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 126, whereas " '[t]he purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident,' " *id.* at ¶ 127, quoting *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 7.

{¶ 43} Here, the capital charges in the indictment tracked the language of R.C. 2903.01(A) and (B), and the death-penalty specifications tracked the language of R.C. 2929.04(A)(7). And Whitaker does not contend that the indictment's omission of any averment as to the relative weight of aggravation and mitigation deprived him of adequate notice of the charges against him. Thus, the indictment

12

does not violate Article I, Sections 9, 10, and 16 of the Ohio Constitution and satisfies the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. *See Sowell* at ¶ 128.

{¶ 44} Based on the foregoing, we reject proposition of law No. XVII.

*B. The kidnapping specifications*

{¶ 45} In proposition of law No. IV, Whitaker argues that the indictment for the felony-murder specification predicated on kidnapping was defective. However, Whitaker failed to raise this objection before trial and thus has forfeited all but plain error. *See State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 26; Crim.R. 12(C)(2).

**1. Indictment not defective**

{¶ 46} The indictment for each aggravated-murder count included a felony-murder-kidnapping specification under R.C. 2929.04(A)(7) that alleged that Whitaker purposely caused A.D.'s death while he was "committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." Counts 6 and 7 alleged two types of kidnapping. Count 6 charged Whitaker with kidnapping "for the purpose of terrorizing or inflicting serious physical harm" on A.D. *See* R.C. 2905.01(A)(3). And Count 7 charged him with kidnapping "for the purpose of engaging in sexual activity" against A.D.'s will. *See* R.C. 2905.01(A)(4).

{¶ 47} "The sufficiency of the kidnapping specifications must be judged solely by reference to the counts in which they are contained. Individual counts in the same indictment are not interdependent but instead stand on their own as individual indictments." *State v. Roe*, 10th Dist. Franklin No. 86AP-59, 1987 WL 16174, *24 (Aug. 25, 1987), citing *State v. Adams*, 53 Ohio St.2d 223, 374 N.E.2d 137 (1978), paragraph two of the syllabus, *vacated on other grounds*, 439 U.S. 811,

13

99 S.Ct. 69, 58 L.Ed.2d 103, and *Browning v. State*, 120 Ohio St. 62, 165 N.E. 566 (1929), syllabus.

**{¶ 48}** Whitaker argues that the indictment was defective because the grand jury failed to specify which of the two kidnapping offenses in the felony-murder-kidnapping specification applied to each aggravated-murder count or alternatively, that the grand jury failed to charge both of the felony-murder-kidnapping specifications for each count of aggravated murder.  Thus, Whitaker contends that the jury double-weighed the kidnapping offenses in Counts 6 and 7 during the mitigation phase and that the sentencing judge did the same.

**{¶ 49}** In *Roe*, 1987 WL 16174, the Tenth District Court of Appeals addressed a similar issue.  Roe was also charged with two counts of aggravated murder (counts one and two), each of which included a specification for committing the charged offense while "committing or attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping."  *Id*. at *23. Roe was also charged with two different types of kidnapping: count four alleged kidnapping by force, threat, or deception, and count five alleged creating a substantial risk of physical harm in removing the victim.  Roe argued that the kidnapping specifications in counts one and two failed to give him sufficient notice of the type of kidnapping alleged in those specifications.  The court of appeals rejected Roe's argument:

> Because of the absence in counts one and two of any express reference incorporating the allegations made in counts four and five, * * * the allegations made in counts four and five will not serve to fill out the specifications in counts one and two.  As a result, the specificity contained in counts four and five as to the type of kidnapping alleged does not necessarily limit the broader, more expansive term 'kidnapping' contained in counts one and two.

*Id*. at \*24.

{¶ 50} As in *Roe*, the felony-murder specifications predicated on kidnapping in this case did not incorporate by reference the separate kidnapping offenses charged in Counts 6 and 7. For the same reasons stated by the appeals court in *Roe*, we conclude that the specificity contained in Counts 6 and 7 as to the types of kidnapping alleged does not limit the offense of kidnapping contained in the felony-murder specifications.

{¶ 51} Whitaker also claims that the indictment violated his rights to due process and fair notice. The appellate court in *Roe* rejected a similar claim, explaining that the kidnapping specifications in that case were sufficient:

> R.C. 2941.14(C) indicates that a specification alleging an aggravating circumstance under R.C. 2929.04 "may be stated in the words of the subdivision in which it appears, or in words sufficient to give the accused notice of the same." Because the kidnapping specifications \* \* \* track the language of R.C. 2929.04(A)(7), R.C. 2941.14(C) was satisfied.

*Roe* at \*24, citing Crim.R. 7(B). Similarly, we have recognized that "an indictment \* \* \* is not defective as long as it 'tracks the language of the criminal statute describing the offense,' because that suffices to 'provide[] the defendant with adequate notice of the charges against him.' " (Brackets added in *Wesson*.) *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 24, quoting *Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, at ¶ 45. In this case, the felony-murder specifications predicated on kidnapping tracked the language of R.C. 2929.04(A)(7). Thus, this court rejects Whitaker's claim that the indictment is defective.

**2. Jury instructions**

**{¶ 52}** Whitaker, in his reply brief, argues that the jury instructions failed to adequately advise the jurors on the kidnapping specifications. But "[a]ppellate courts generally will not consider a new issue presented for the first time in a reply brief." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18. Because Whitaker raised this issue for the first time in his reply brief to this court, we decline to address this issue.

**3. No double-weighing in the sentencing opinion**

**{¶ 53}** Whitaker also contends that the trial court double-weighed the aggravating circumstance of kidnapping, based on the two kidnapping convictions. Whitaker points to the following language in the sentencing opinion in support of his contention:

> The second aggravating circumstance found by the jury by proof beyond a reasonable doubt involved the kidnapping of A.D. * * * during the commission of Aggravated Murder. Kidnapping is charged in both counts six and seven. Count six references for the purpose of terrorizing or inflicting serious physical harm upon A.D. * * * Count seven references the kidnapping for the purpose of sexual activity which has already been discussed.

**{¶ 54}** R.C. 2929.03(F) provides, in part:

> The court or panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to * * * the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances

16

the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

The trial court correctly identified the three aggravating circumstances—the rape of A.D., the kidnapping of A.D., and the aggravated burglary during the commission of aggravated murder—in its opinion. And the trial court concluded its findings by stating: "[I]t is the decision of the Court that *the three aggravating circumstances* involving the aggravated murder of A.D. * * * outweigh the mitigating factors beyond a reasonable doubt." (Emphasis added.) The trial court identified the correct number of aggravating circumstances, and nothing in its sentencing opinion indicates that it double-weighed the kidnapping specifications. *Compare State v. Hill*, 73 Ohio St.3d 433, 441, 653 N.E.2d 271 (1995) (when a court correctly identifies the aggravating circumstances, "that court is presumed to rely only on [those] circumstance[s], and not on nonstatutory aggravating circumstances"). Thus, no error occurred.

{¶ 55} Based on the foregoing, we reject proposition of law No. IV.

*C. Sufficiency of the evidence for the aggravated-burglary conviction*

{¶ 56} In proposition of law No. II, Whitaker argues that there was insufficient evidence to convict him of aggravated burglary.

**1. Relevant facts**

{¶ 57} Lavontay McKenzie owned the Fuller Avenue house. He bought it from his father two years before the murder and planned to "fix it up, do like a group home * * * or something on that level." McKenzie testified that the house was undergoing renovations at the time of the murder. He testified, "I tried to just do a good cleanout, tore up the carpet, dug up the tile in the upstairs floor" and "ripped up the two kitchens * * * and flooring in the bathroom." McKenzie and his cousin worked on the renovations during the summer of 2016, and that was the last time he had been in the house. He secured the house by locking the front door

and leaving a pit bull in the backyard. However, the city removed the pit bull approximately four to six months before the murder. McKenzie testified that he had actually been inside the house only "three or four times." But he had never given anyone else permission to enter the house.

## 2. Relevant statutes

{¶ 58} R.C. 2911.11(A) defines aggravated burglary as follows:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

* * *

(C) As used in this section:

(1) "Occupied structure" has the same meaning as in section 2909.01 of the Revised Code.

{¶ 59} Under R.C. 2909.01(C)(1), the definition of an "occupied structure" includes a house that "is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present."

## 3. Sufficiency of the evidence

{¶ 60} Whitaker was convicted of aggravated burglary based on evidence that he forcibly entered the Fuller Avenue house with A.D., where he raped and murdered her. But Whitaker argues there was insufficient evidence that an

18

aggravated burglary occurred because, he contends, the Fuller Avenue house was not an occupied structure at the time of the offense.

{¶ 61} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 62} "A structure which is dedicated and intended for residential use, and which is not presently occupied as a person's habitation, but, which has neither been permanently abandoned nor vacant for a prolonged period of time, can be regarded as a structure 'maintained' as a dwelling within the meaning of R.C. 2909.01(A)." *State v. Green*, 18 Ohio App.3d 69, 480 N.E.2d 1128 (10th Dist.1984), paragraph one of the syllabus. "Even homes undergoing major renovations have been found to be occupied structures," *State v. Johnson*, 188 Ohio App.3d 438, 2010-Ohio-3345, 935 N.E.2d 895, ¶ 18 (2d Dist.), because "the definition of 'occupied' in the Revised Code is far broader than in ordinary usage," *id*. at ¶ 20.

{¶ 63} Even when viewing the facts of this case in a light most favorable to the state, no rational trier of fact could have found that the Fuller Avenue house was an "occupied structure," as defined in R.C. 2909.01(C)(1), at the time of the offense. McKenzie testified that the Fuller Avenue house was vacant because it was undergoing renovations. McKenzie further stated that, during the period relevant to this case, the house was in the process of being gutted. Moreover, there is no testimony about when the house was last occupied, indicating that it had been years since anyone lived there. Despite McKenzie's stated intention to renovate the house to make it suitable for future inhabitants, the evidence demonstrates that it had been a prolonged period since the house had been occupied and that it would

remain unoccupied indefinitely. We accordingly conclude, based on the evidence before us, that the house was not maintained as a permanent or temporary dwelling. Viewing the evidence in the light most favorable to the state, we conclude that there was insufficient evidence to convict Whitaker of aggravated burglary. His aggravated-burglary conviction is therefore vacated. We further vacate the finding of guilt on Count 3, felony murder during an aggravated burglary (which was merged with Count 4 for purposes of sentencing) and we reverse the trial court's judgment on the death-penalty specifications predicated on aggravated burglary and dismiss those specifications. *See State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 245.

{¶ 64} Having concluded that there was insufficient evidence to convict Whitaker of aggravated burglary, proposition of law No. III, in which Whitaker argues that his conviction for aggravated burglary is against the manifest weight of the evidence, is rendered moot; therefore we need not address it.

*D. Ineffective assistance of counsel for failing to challenge the kidnapping and aggravated-burglary convictions*

{¶ 65} In proposition of law No. V, Whitaker argues that he was denied effective assistance of counsel because his attorneys failed to challenge the kidnapping and aggravated-burglary convictions.

{¶ 66} Reversal of a conviction based on ineffective assistance of counsel requires that the defendant show that counsel's performance was deficient and that the deficient performance prejudiced the defendant to such a degree that it deprived the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶ 67} Based on our conclusion above that there was insufficient evidence to support Whitaker's aggravated-burglary conviction, we conclude that his

ineffective-assistance-of-counsel argument in regard to that conviction is moot, and we need not address it.

{¶ 68} In regard to the kidnapping conviction, Whitaker claims that defense counsel failed to provide a meaningful argument at trial to explain why the court should grant his Crim.R. 29 motion for acquittal on the felony-murder specifications based on kidnapping. "A motion for acquittal may be granted only when, construing the evidence most strongly in favor of the state, the evidence is insufficient to sustain a conviction." *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 146.

{¶ 69} As explained in our analysis of proposition of law No. IV, the felony-murder death specifications predicated on kidnapping were not defective. Whitaker fails to explain any additional arguments that defense counsel should have made before the trial court in support of his motion for acquittal on those specifications. Thus, he has not established that defense counsel were deficient in the handling of his Crim.R. 29 motion in regard to those specifications. *See id.* (failure to make a Crim.R. 29 motion not deficient when such motion would be futile).

{¶ 70} During opening statements, defense counsel informed the jury: "At [Whitaker's] direction * * * he doesn't want to make a circus out of this. That's why * * * we're not contesting liability. * * * We're not contesting that he did it." Instead, defense counsel argued during closing arguments that Whitaker claimed he was high on drugs at the time of A.D.'s murder, and defense counsel challenged evidence that Whitaker was guilty of murder with prior calculation and design. During mitigation, defense counsel referred to Whitaker's desire not to make the trial into a circus as a reason not to impose a death sentence.

{¶ 71} Whitaker argues that counsel was unjustified in acknowledging Whitaker's admission of guilt before the jury. But defense counsel could not at the same time have credibly argued to the jury that Whitaker was not contesting liability. And simply because there might have been " 'another and better strategy

available' " does not mean that counsel provided ineffective assistance. *State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, 88 N.E.3d 935, ¶ 19, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). Given the overwhelming evidence of Whitaker's guilt, Whitaker's counsel made a rational decision to concede that Whitaker had committed the aggravated-kidnapping death-penalty specifications. This concession allowed defense counsel to maintain credibility and focus the jury's attention on evidence that Whitaker was not guilty of murder with prior calculation and design and on mitigating evidence supporting the imposition of a life sentence. *See Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, at ¶ 141; *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 60.

**{¶ 72}** Furthermore, during opening statements, defense counsel told the jury that Whitaker had requested that counsel concede his guilt, and Whitaker does not dispute that statement. *Compare McCoy v. Louisiana*, __ U.S. ___, ___, 138 S.Ct. 1500, 1511, 200 L.Ed.2d 821 (2018) (counsel's concession of client's guilt over client's express objection constitutes structural error). Accordingly, this claim of ineffective assistance of counsel lacks merit.

**{¶ 73}** Based on the foregoing, we reject proposition of law No. V as to the kidnapping conviction, and we conclude that the proposition is moot as to the aggravated-burglary conviction.

*E. Weighing of the aggravating circumstances*

**{¶ 74}** In proposition of law No. XIII, Whitaker argues that the jury improperly weighed the aggravating circumstances against the mitigating factors in a manner that tipped in favor of the aggravating circumstances.

**{¶ 75}** First, Whitaker recasts his claims as to the sufficiency of the evidence of the aggravated-burglary offense, arguing that the jury and the trial court improperly weighed aggravated burglary as an aggravating circumstance because the state failed to prove that offense. Consistent with our above analysis, the jury

and the trial court should not have considered aggravated burglary as an aggravating circumstance during the mitigation phase. *See Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, at ¶ 222 ("When a defendant's death sentence is based in part on an invalid specification, we can cure the error by excluding that specification from our independent reweighing of the death sentence, so long as at least one valid specification remains"). As explained below, even without considering aggravated burglary as an aggravating circumstance, the aggravating circumstances in this case outweigh the mitigating factors beyond a reasonable doubt. We therefore conclude that any consideration of aggravated burglary as an aggravating circumstance during the mitigation phase constituted harmless error.

{¶ 76} Second, Whitaker recasts his defective-indictment claims regarding the aggravating circumstance of kidnapping, arguing that both the jury and the trial court considered two kidnapping offenses rather than one as aggravating circumstances. But as discussed in our analysis of proposition of law No. IV, individual counts in the same indictment stand on their own, and the separate kidnapping offenses in Count 6 (kidnapping "for the purpose of terrorizing or inflicting serious physical harm") and Count 7 (kidnapping "for the purpose of engaging in sexual activity" with A.D. against her will) do not limit the offense of kidnapping in the aggravating circumstances. Further, as previously discussed, the trial court correctly identified the three aggravating circumstances in its sentencing opinion, and nothing indicates that either the jury or the trial court double-weighed the kidnapping specifications.

{¶ 77} Based on the foregoing, we reject proposition of law No. XIII.

*F. Sufficiency and manifest weight of the evidence for gross abuse of a corpse*

{¶ 78} In proposition of law No. VI, Whitaker argues that there was insufficient evidence to convict him of gross abuse of a corpse. And in proposition

of law No. VII, he argues that his conviction for gross abuse of a corpse is against the manifest weight of the evidence.

**{¶ 79}** Gross abuse of a corpse is defined in R.C. 2927.01(B): "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." The factual basis for this charge rested in Whitaker's admission that after he attacked A.D., he tried to hide her body by "dragg[ing] her to the closet."

**{¶ 80}** Whitaker claims that there was no evidence showing that he inflicted any injury on A.D.'s corpse. But Whitaker's admission that he dragged A.D. to the closet after attacking her belies that claim. And evidence of an attempt to conceal a body is sufficient to sustain a conviction for gross abuse of a corpse. *See State v. Bridges*, 8th Dist. Cuyahoga No. 100805, 2014-Ohio-4570, ¶ 63-64 (victim's body dumped into a pond after being tied to a metal pipe and cinder block); *State v. Nobles*, 106 Ohio App.3d 246, 267, 665 N.E.2d 1137 (2d Dist.1995) (victim's body kept in a closet for several days before being placed in a dumpster).

**{¶ 81}** Whitaker also claims that there is no evidence that A.D. was dead at the time the alleged abuse of a corpse occurred. Dr. Dolinak, the medical examiner, testified that A.D. was alive when the majority of injuries were inflicted on her. He was unsure whether A.D. was alive when she received abrasions on her right breast and the front side of her chest because he did not see any hemorrhage with those injuries. But he testified that A.D. could have bled out a couple of minutes after her carotid artery was cut. Thus, there was sufficient evidence for a jury to conclude that A.D. was dead when Whitaker tried to hide her body by dragging her to the bedroom.

**{¶ 82}** Whitaker next argues that the evidence would need to show that A.D.'s body was taken away from the murder scene and dumped elsewhere to constitute gross abuse of a corpse. But R.C. 2927.01(B) "proscribes a broad range of conduct provided that it is so inappropriate and insensitive as to outrage

community standards." *State v. Condon*, 152 Ohio App.3d 629, 2003-Ohio-2335, 789 N.E.2d 696, ¶ 52 (1st Dist.). The statute does not require that Whitaker take affirmative steps to conceal A.D.'s body. *See State v. Warfel*, 9th Dist. Medina No. 16CA0062-M, 2017-Ohio-5766, ¶ 22-24 (failure to report victim's death until after the remains were discovered and failure to properly handle the remains was sufficient evidence for the trier of fact to determine that the defendant had abused the corpse).

{¶ 83} Viewing the evidence in a light most favorable to the state, we conclude that Whitaker's admissions, Dr. Dolinak's testimony, and police testimony regarding the location and condition of A.D.'s body constituted sufficient evidence on which to convict Whitaker of gross abuse of a corpse. As for Whitaker's manifest-weight challenge, this is not " 'the exceptional case in which the evidence weighs heavily against the conviction.' " *Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, at ¶ 86, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Given the strength of the evidence, we conclude that the jury neither lost its way nor created a miscarriage of justice in convicting Whitaker of gross abuse of a corpse.

{¶ 84} Based on the foregoing, we reject proposition of law Nos. VI and VII.

### G. Prosecutorial misconduct

{¶ 85} In proposition of law No. I, Whitaker alleges various incidents of trial-phase prosecutorial misconduct. Except where noted, defense counsel failed to object to the prosecutor's alleged misconduct at trial and has thus forfeited all but plain error. *State v. Hartman*, 93 Ohio St.3d 274, 293, 754 N.E.2d 1150 (2001) (defense counsel's failure to object to prosecutorial misconduct during trial waived all but plain-error review).

{¶ 86} "The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." *State v. Fears*, 86 Ohio St.3d

329, 715 N.E.2d 136 (1999). The touchstone of our analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *State v. Cornwell*, 86 Ohio St.3d 560, 570-571, 715 N.E.2d 1144 (1999).

### 1. Presentation of unnecessary evidence

{¶ 87} Whitaker argues that the prosecutor presented unnecessarily detailed, extensive, and horrific evidence of A.D.'s murder during the trial after defense counsel conceded Whitaker's guilt during opening statements. At bottom, these arguments are evidentiary claims. Accordingly, we must determine whether the challenged evidence was properly admitted. Because "[a] trial court enjoys broad discretion in admitting evidence[, we] will not reject an exercise of this discretion unless it clearly has been abused and the criminal defendant thereby has suffered material prejudice." *State v. Long*, 53 Ohio St.2d 91, 98, 372 N.E.2d 804 (1978).

{¶ 88} Evidence is relevant and therefore generally admissible under Evid.R. 402 if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. A trial court may exclude relevant evidence if "its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B). Further, a court must exclude evidence when its "probative value is substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A).

{¶ 89} Contrary to Whitaker's arguments, neither the Rules of Evidence nor this court's precedents make "necessity" a prerequisite for admissibility. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 115. "If the evidence was properly admitted, then the prosecutor's decision to offer it cannot form the basis for a misconduct claim." *Id.* at ¶ 116.

**{¶ 90}** First, Whitaker argues that the prosecutor should not have presented evidence about A.D.'s ride on the RTA bus, her failure to show up for school, or the search for A.D. But this evidence was relevant in explaining the time and location of A.D.'s disappearance. It also supported a finding that Whitaker acted with purpose when he murdered A.D. *See id*. at ¶ 121. Thus, no misconduct occurred in the presentation of this evidence.

**{¶ 91}** Second, Whitaker contends that the prosecutor should not have introduced evidence about "[t]he amount of blood" and the way A.D.'s injuries were inflicted. The prosecution, over a defense objection, introduced photographs showing bloody boot prints, a trail of blood leading from the dining room to the bedroom where A.D.'s body was found, and blood smears and a larger amount of blood found underneath A.D.'s body. The boot prints matched Whitaker's boots and helped to identify him as the murderer, and the bloody smears underneath A.D.'s body showed that A.D. was attacked in the dining room and dragged to the bedroom. All this evidence was admissible to illustrate the nature and circumstances of the crime that had occurred inside the Fuller Avenue house. *See id.* at ¶ 124. Even if any of this evidence had been improperly admitted by the court, any such error would not have affected the outcome of the trial in view of the other overwhelming evidence of Whitaker's guilt. *See State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 256.

**{¶ 92}** Finally, Whitaker complains about "detailed photographs" without identifying any specific photos that are objectionable. The most detailed and gruesome photos introduced at trial were the autopsy photos. Assuming that Whitaker is complaining about those photos, his argument lacks merit. Dr. Dolinak used the autopsy photos to illustrate his testimony about A.D.'s wounds and her cause of death. Dr. Dolinak testified that several of the photos showed that the injuries may have been caused by tools found inside the Fuller Avenue house and by the sole of Whitaker's boots. The photos depicted different injuries and do not

appear to have been cumulative.  But even if any of these photos had been admitted in error, Whitaker cannot show that the outcome of the trial would have differed had the error not occurred, given the other overwhelming evidence of Whitaker's guilt.  *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 106, fn. 5.  Further, there is no evidence that these photos improperly affected the jury during the mitigation phase.  *See id.*

### 2. Trial-phase closing argument

{¶ 93} Whitaker claims that the prosecutor's extensive and detailed closing argument was unnecessary because Whitaker was not contesting his guilt.  But Whitaker presents no authority that would place limitations on the prosecution's closing arguments when defense counsel concedes the defendant's guilt during opening statements.  Indeed, during closing arguments in this case, defense counsel argued that prior calculation and design was not proven, thereby contesting Whitaker's guilt on that issue.  Whitaker's arguments on this point are rejected.

{¶ 94} Whitaker also makes specific claims about the prosecutor's closing arguments.  Except where noted below, Whitaker failed to object to these arguments at trial and cannot prevail on these claims absent plain error.  *See State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992).

{¶ 95} First, Whitaker contends that the prosecutor improperly told the jury, "[Whitaker] took her innocence."  But the prosecutor's characterization of the rape and murder of A.D., a 14-year-old victim, represented fair comment.  *See State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 119.  Accordingly, Whitaker's contest of this statement by the prosecutor is not well-taken.

{¶ 96} Second, Whitaker argues that the prosecutor improperly told the jury that "[t]hose that hunt and prey, they do so on the smallest of us, on the most vulnerable of us, on our children."  Both parties have latitude during closing arguments and may be "colorful or creative" but not purely abusive, inflammatory, or purely derogatory.  *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523

28

(1988). Here, the prosecutor's remarks to the jury were directed at Whitaker's actions and had no demonstrable prejudicial effect, considering the strength of the evidence establishing Whitaker's guilt. Thus, the prosecutor's remarks in this regard were permissible. *See State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 245.

{¶ 97} Finally, Whitaker argues that the following statements that the prosecutor made to the jury were improper:

> Her injuries can testify. The horror inflicted upon her can testify. She can show us what happened to her through her injuries.
>
> That's why we had to show you those photos, ladies and gentlemen. We were forced to. We have to show them to you because the burden is on us and because that is where you get the most credible evidence, through the science, through the scene, because that is your job, is to determine the credibility of the evidence.

{¶ 98} "A prosecutor may state his or her opinion if it is based on the evidence presented at trial." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 213. The prosecutor's remarks about the "horror" inflicted on A.D. represented fair comment based on the photos and other evidence showing that her murder was caused by injuries that Whitaker had inflicted on her with a power drill, screwdrivers, and other tools.

{¶ 99} Whitaker also complains that the prosecutor later argued that the photos were "important, because [they] give[] you an understanding of what happened to her." But the prosecutor's comments to the jury about the importance of the photos in the context of the state's burden of proof and the scientific evidence

also represented fair comment. Accordingly, no plain error occurred in the prosecutor's trial-phase closing argument.

### 3. "Cast of characters" display

{¶ 100} Whitaker argues that the trial court erred by admitting victim-impact evidence in the form of a photo display of A.D. and the lay witnesses who testified during the state's case-in-chief.

### *a. Displayed photos*

{¶ 101} The prosecution, over defense counsel's objection, presented a "cast of characters" board displaying photos of A.D. and most of the state's lay witnesses. The prosecutor placed a photo of each of these witnesses on the board after the witness testified: A.D.'s mother; A.D.'s school principal; J.P., a student who rode the bus with A.D.; J.R., the student who missed A.D. at the bus stop on the day she went missing; Alton Sanders, Whitaker's friend; Lavontay McKenzie, the owner of the Fuller Avenue house; and David Brewton, the church pastor who saw Whitaker on the day of the murder.

{¶ 102} In response to defense counsel's objection, the prosecutor explained that he wanted "everybody who is a lay witness on this trial to be added to the board so the jury understands who came and testified." In allowing the display, the trial court informed the prosecutor, "We'll just turn it around when one of your cast members is on the stand." At the close of the evidence, the trial court admitted all the photos into evidence.

### *b. Analysis*

{¶ 103} "Victim-impact evidence includes evidence relating to the victim's personal characteristics and the impact the crime had on the victim's family." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 113. Admission of victim-impact evidence is generally limited to the sentencing phase of death-penalty proceedings. *Id.*, citing R.C. 2930.13, 2930.14(A), and 2947.051, and Article I, Section 10(a)(A)(3), Ohio Constitution. Victim-impact evidence can

be admitted only when the evidence is relevant to the facts attendant to the offense. *Id.*; *see also id.* at ¶ 136; Evid.R. 402 (evidence that is irrelevant is inadmissible). "Such evidence should not be overly emotional or directed to the penalty to be imposed." *State v. McAlpin*, ___ Ohio St.3d ___, 2022-Ohio-1567, ___ N.E.3d ___, ¶ 113, citing *Graham* at ¶ 113, 136 and Evid.R. 403(A) ("evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury").

{¶ 104} Whitaker argues that the photos of A.D. and of A.D.'s mother, the principal, and the boy who rode the bus with A.D. constituted victim-impact evidence that was presented to inflame the passions of the jury and make the jurors see him as a monster in contrast with A.D.'s innocence. The state contends that none of the photos constituted victim-impact evidence.

{¶ 105} The state invokes *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 108-109, in arguing that the photos were admissible because they related to the facts attendant to the offenses charged. In *Myers*, photos of the victim holding her daughter, of the victim's tattoo, and of the victim's daughter were introduced. *Id*. at ¶ 107. We held that the photos of the victim holding her daughter and of the victim's tattoo were admissible because they aided other witnesses in identifying the victim, and the photos of the victim's daughter were in the victim's billfold found underneath the front seat of her car. *Id*. at ¶ 108-109. Unlike in *Myers*, none of the witness photos on the display board in this case related to the facts attendant to the offenses with which Whitaker was charged. Thus, *Myers* is inapposite.

{¶ 106} First, we note that lay witnesses Sanders, McKenzie, and Brewton had no connection to A.D. or her family; therefore, their photos were not victim-impact evidence. However, we find that the photo display of A.D. and of A.D.'s mother, principal, and two of A.D.'s friends constituted victim-impact evidence. The prosecutor claimed that the witness photos were displayed for the jury to see

who came and testified. But the jury observed the witnesses and did not need to see the photos to understand who testified. Instead, the photos of A.D. and of her mother, principal, and friends served as a visual reminder of the different ways that A.D.'s family and friends were affected by her death.

**{¶ 107}** Nonetheless, we hold that none of this evidence resulted in reversible error. In *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 126, we listed six factors to consider when determining whether victim-impact evidence was overly emotional and resulted in prejudicial error:

> (1) the length of the victim-impact testimony; (2) whether witnesses, jurors, and audience members showed physical signs of emotion during the testimony; (3) the detail and depth of the victim-impact testimony with regard to the murder victim; (4) whether the victim-impact witness used emotionally charged language; (5) the number of victim-impact witnesses; and (6) our precedent in similar cases involving allegedly overly emotional victim-impact testimony.

(Citations omitted.)

**{¶ 108}** Arguably, two *Graham* factors apply here: the length of the testimony (because the photo board was displayed throughout each witness's testimony) and the number of witnesses. Photos were added to the display during the testimony of each witness and displayed repeatedly over the course of the trial. However, victim-impact testimony did not immediately precede the display of the photos, thus limiting their emotional impact. *See Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, at ¶ 79. Moreover, the number of witnesses was not excessive. *See Lawler v. State*, 276 Ga. 229, 232, 576 S.E.2d 841 (2003) (five victim-impact witnesses testified, but because each witness's testimony was brief, the trial court did not abuse its discretion in allowing the testimony).

**{¶ 109}** Here, the photos of A.D. and of A.D.'s mother, principal, and two of her friends were impactful but insufficient to inflame the passions of the jurors and inhibit them from making objective and rational decisions regarding Whitaker's guilt or the appropriate punishment. Thus, we conclude that this evidence was not overly emotional. *See Graham* at ¶ 133.

**{¶ 110}** Based on the foregoing, we reject proposition of law No. I.

*H. Compelled psychiatric examination*

**{¶ 111}** In proposition of law No. VIII, Whitaker challenges the trial court's order compelling him to undergo a psychological examination by a state-selected psychiatrist.

**1. Relevant background**

**{¶ 112}** Shortly after the trial began, the state moved for Whitaker to submit to a psychological examination. The state asserted that Whitaker had retained Dr. Robert Kaplan, a psychologist, who completed a report stating that Whitaker is "addicted to alcohol, cocaine, and cannabis" and that Whitaker's "memory of the offense was impaired because of a variety of factors." The state intended to retain a psychological expert to review Dr. Kaplan's report and all the relevant records and to personally evaluate Whitaker to rebut Dr. Kaplan's findings.

**{¶ 113}** At a subsequent hearing, defense counsel objected to Whitaker's being examined by the state's expert, because Dr. Kaplan was going to address mitigating factors rather than a medical diagnosis like brain trauma. Further, defense counsel argued that subjecting Whitaker to examination by the state's expert forced him "to choose between his 8th Amendment right to present mitigation and his Fifth Amendment right not to incriminate himself." The state rejoined that Whitaker's Fifth Amendment concerns were not implicated, because the state has the right to present rebuttal testimony once a defendant has elected to present a mental-health expert to testify. The state added that Dr. Kaplan's report addressed Whitaker's mental status and that Dr. Kaplan had concluded that

Whitaker was not able to control his behavior due to a combination of dissociation and cocaine intoxication.  The trial court granted the state's motion.

{¶ 114} During the mitigation phase, Dr. Kaplan testified that Whitaker "was under the influence of repressed anger that was released in an uncontrolled and violent manner" when he killed A.D.  Dr. Kaplan stated that Whitaker repressed the anger that he had developed after he witnessed domestic violence against his sister when he was young.  Dr. Kaplan added that Whitaker had developed "a maladaptive coping system [of] dissociation" that impaired his ability to control his behavior and explained his inability to recall "the actual act of violence" against A.D.  Dr. Kaplan also testified that Whitaker's cocaine intoxication contributed to his inability to control his behavior.

{¶ 115} Dr. Kaplan did not diagnose Whitaker with an antisocial personality disorder.  He opined that Whitaker does not meet the criteria under the *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-5*") (5th Ed.2013) for "the diagnosis of any paraphilic disorder, including a pedophilic disorder."  And he stated that Whitaker is remorseful about the offenses.  Dr. Kaplan also opined that Whitaker would not be facing capital-murder charges if his mother had not died when he was young, he had had a positive male role model, and he had not witnessed domestic violence against his sister.

{¶ 116} The state introduced the testimony of Dr. Sara West, a forensic psychiatrist, in rebuttal.  She testified that Dr. Kaplan diagnosed Whitaker with three substance-use disorders and an adjustment disorder with mixed anxiety and depressed mood.  Dr. West also testified that testing performed by Dr. Kaplan "indicated a low probability of dissociation" and that the evidence suggested that Whitaker did not black out at the time of the offense.  She stated that no evidence corroborated Whitaker's statement that he was under the influence of cocaine at the time of the offenses.  Unlike Dr. Kaplan, Dr. West did not believe that Whitaker was remorseful, because he expressed a lack of remorse during his phone calls from

jail.  She also disagreed that the three events that Dr. Kaplan had referred to in Whitaker's life led to his facing capital-murder charges.

### 2. Whitaker's claims

### *a. No Fifth Amendment violations*

{¶ 117} Whitaker contends that the compelled examination violated the Fifth Amendment because he had not placed his state of mind directly in issue.  He also contends that by ordering the examination, the trial court forced him to choose between his Fifth Amendment right against self-incrimination and his Eighth Amendment right to present mitigating evidence.

{¶ 118} We rejected Whitaker's first argument in *Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, at ¶ 120-121, in which we concluded that "when the defendant demonstrates an intention to use expert testimony from a mental examination in the penalty phase, the Fifth Amendment permits the trial court to order that the defendant submit to a mental examination by an expert of the state's own choosing."  *See also Buchanan v. Kentucky*, 483 U.S. 402, 422-424, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Kansas v. Cheever*, 571 U.S. 87, 93-95, 134 S.Ct. 596, 187 L.Ed.2d 519 (2013).

{¶ 119} *Madison* also provides a basis for rejecting Whitaker's claim that the trial court forced him to forfeit his Fifth Amendment right to remain silent as a condition of exercising his Eighth Amendment right to obtain and present mitigating evidence in a capital case.  In *Madison*, we explained that the right to present mitigating evidence stems from the right to individualized capital sentencing and that "the principle of individualized capital sentencing is not undermined by requiring the defendant to submit to an examination by a state expert" when the defendant opts to submit psychiatric evidence.  *Id*. at ¶ 124.  "Nor does such an examination undermine the policies of the Fifth Amendment," *id.* at ¶ 125, because " '[a] defendant 'has no right to set forth to the jury all the facts which tend in his favor without laying himself open to cross-examination upon

those facts." ' " *Id*., quoting *Cheever* at 94, quoting *Fitzpatrick v. United States*, 178 U.S. 304, 315, 20 S.Ct. 944, 44 L.Ed. 1078 (1900).

### b. Madison *does not misconstrue United States Supreme Court precedents*

{¶ 120} Whitaker argues that this court's opinion in *Madison* misconstrues United States Supreme Court precedents that establish a trial court's right to compel a defendant to undergo a psychiatric examination. Whitaker claims that *Buchanan* and *Cheever* require that (1) the defendant place his mental state directly in issue and (2) the state's psychiatric evidence be only for the limited purpose of rebutting the defendant's mental-status evidence.

{¶ 121} In *Buchanan*, the Supreme Court held that when a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal. 483 U.S. at 422-423, 107 S.Ct. 2906, 97 L.Ed.2d 336. Under these circumstances, the state was allowed to rebut Buchanan's " 'mental status' defense of extreme emotional disturbance" with expert testimony. *Id*. at 423.

{¶ 122} In *Cheever*, the United States Supreme Court addressed the scope of a mental-status defense when the defendant is subject to a state-ordered psychiatric evaluation. The Kansas Supreme Court had held that the defense of voluntary intoxication was not a mental disease or defect that would subject the defendant to a compelled psychiatric evaluation. *Cheever*, 571 U.S. at 96, 134 S.Ct. 596, 187 L.Ed.2d 519. The United States Supreme Court reversed, stating that " 'mental status' is a broader term than 'mental disease or defect' " and that "[d]efendants need not assert a 'mental disease or defect' in order to assert a defense based on 'mental status.' " *Id*. Thus, the state was allowed to offer evidence from a court-ordered mental examination for the limited purpose of rebutting the defendant's evidence. *Id*. at 97-98. The *Cheever* court added that "[a]ny other rule would undermine the adversarial process, allowing the defendant to provide the

36

jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime." *Id*. at 94.

{¶ 123} Whitaker claims that he did not place his mental status directly in issue, because he did not assert any psychiatric diagnosis during the trial-phase proceedings. However, neither *Buchanan* nor *Cheever* requires a defendant to assert a psychiatric diagnosis during the trial-phase proceedings before the state is allowed to present a state-ordered psychiatric evaluation. Similarly, the state is not limited to rebutting only a psychiatric diagnosis. Accordingly, we reject Whitaker's narrow reading of *Buchanan* and *Cheever*.

### c. Civ.R. 35(A) permitted the mental examination

{¶ 124} Whitaker also argues that the Rules of Civil Procedure do not allow the trial court to order a capital defendant to submit to a psychological examination by the state's expert.

### (1) Relevant background

{¶ 125} Civ.R. 35(A) provides that "[w]hen the mental or physical condition * * * of a party, or a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit himself to a physical or mental examination." Whitaker argues that the prosecution could not rely on Civ.R. 35(A) as the basis to conduct the state's psychiatric examination.

{¶ 126} Crim.R. 57(B) states: "If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules of criminal procedure, and shall look to the rules of civil procedure and to the applicable law if no rule of criminal procedure exists." In the state's motion for a psychiatric examination, and in its brief to this court, the state argued that this rule permitted the trial court to rely on Civ.R. 35(A) to order the examination because the Criminal Rules of Procedure provided no comparable rule.

(2) Analysis

**{¶ 127}** There are no criminal rules governing whether or when a court may order a defendant to submit to a mental examination. In *State v. Schlee*, 117 Ohio St.3d 153, 2008-Ohio-545, 882 N.E.2d 431, ¶ 10, we held that "Crim.R. 57(B) permits a trial court in a criminal case to look to the Rules of Civil Procedure for guidance when no applicable Rule of Criminal Procedure exists." And in *State v. Madison*, 8th Dist. Cuyahoga No. 101478, 2015-Ohio-4365, the court of appeals permitted Civ.R. 35(A) to serve as a basis for ordering the defendant to submit to the state's psychological examination.

**{¶ 128}** Whitaker invokes *State v. Ross*, 128 Ohio St.3d 283, 2010-Ohio-6282, 943 N.E.2d 992, in arguing that Crim.R. 57(B) does not automatically authorize the use of the Rules of Civil Procedure whenever the criminal rules fail to specifically address a procedural tool. In *Ross*, this court held that parties may not resort to the Rules of Civil Procedure to obtain reconsideration of an order denying a motion for acquittal under Crim.R. 29 after the period governing such motions expires. *Id*. at ¶ 43-45. We stated that Crim.R. 29 "provides a detailed, specific procedure governing the time that motions for acquittal must be made" and "[e]ven though Crim.R. 29(C) does not specifically address reconsideration of a denial of a motion for acquittal * * *, it can hardly be said that 'no procedure is specifically prescribed by rule' regarding the timing of Crim.R. 29(C) motions." *Id*. at ¶ 43. But unlike in *Ross*, there is no procedure in the criminal rules to order a defendant to submit to the state's psychiatric examination. Thus, *Ross* is inapposite.

**{¶ 129}** Next, citing *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 439, 639 N.E.2d 83 (1994), Whitaker argues that Crim.R. 57(B) precludes resorting to Civ.R. 35(A) to compel the psychiatric examination in this case because the discovery rules under Crim.R. 16 cover the entire field of criminal discovery. But *Steckman*'s discussion about criminal discovery did not involve applying the Rules

of Civil Procedure to criminal cases. Rather, *Steckman* addressed a defendant's use of a statute, R.C. 149.43 (the Public Records Act), to obtain records from law-enforcement officials and prosecutors in pending criminal cases. *Id*. at 428-429. Our comments in *Steckman* about the scope of criminal discovery should not be read to negate the applicability of Civ.R. 35(A) in the criminal-discovery context. Thus, we also reject this argument.

{¶ 130} In conclusion, we hold that the trial court could look to Civ.R. 35(A) to order Whitaker to submit to the state's psychiatric examination.

### d. Court-ordered mental examination not limited to pretrial psychiatric evaluations

{¶ 131} Whitaker argues that the General Assembly has established the limited circumstances in which the trial court could compel him to undergo a state-conducted psychiatric examination. He contends that these include evaluations for competency to stand trial and to enter a plea of not guilty by reason of insanity, R.C. 2945.371(A), and evaluations to determine whether "the defendant suffered, at the time of the commission of the offense, from the 'battered woman syndrome,' " R.C. 2945.371(G).

{¶ 132} However, the state's ability to obtain a court-ordered mental examination is not limited to cases involving these statutory circumstances. Accordingly, Whitaker's attempt to limit the circumstances of such evaluations is also rejected.

### e. Court-ordered mental examination not limited when defendant presents mental evidence during mitigation

{¶ 133} Whitaker argues that R.C. 2929.03(D)(1) "imposes a burden" on a capital defendant to present a broad range of mitigating evidence during the mitigation phase of the trial. Accordingly, he suggests that the state is limited in its ability to force a death-eligible defendant to respond to questions. But we have already rejected the same argument, holding, "We find nothing in R.C.

2929.03(D)(1) that bars a trial court from ordering a psychiatric examination of a defendant for the purpose of rebutting psychiatric evidence that the defendant intends to introduce." *Madison,* 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, at ¶ 112.

{¶ 134} Based on the foregoing, we reject proposition of law No. VIII.

*I. State's mental examination without counsel's presence*

{¶ 135} In proposition of law No. IX, Whitaker contends that the trial court denied his Sixth Amendment right to counsel by not allowing defense counsel to be present during his compelled examination. Although defense counsel objected to the psychiatric examination, counsel did not argue that Whitaker was deprived of his right to counsel at the examination. Thus, Whitaker has forfeited all but plain error. *See State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 22-24.

{¶ 136} In *Madison*, we rejected the same claim, holding that the Sixth Amendment does not entitle a defendant to have his attorney present during a compelled psychiatric examination. *Madison,* 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, at ¶ 130. But Whitaker argues that this court's holding in *Madison* violates clearly established federal and state constitutional law.

{¶ 137} Whitaker invokes *Montejo v. Louisiana*, 556 U.S. 778, 129 S.Ct. 2079, 173 Ed.2d 955 (2009), in arguing that he has the right to counsel's presence at the psychiatric examination because, he contends, there is a right to counsel at "critical stages" of the criminal proceeding, *id.* at 786, and "[i]nterrogation by the State is such a stage," *id.* However, *Montejo* is inapposite because it involved a police interrogation after a defendant requested counsel, not the defendant's right to the presence of counsel during a compelled psychiatric examination. And as other courts have held, a compelled psychiatric interview is not a "critical stage" of the proceedings requiring the presence of counsel. *See, e.g.*, *United States v. Byers*, 740 F.2d 1104, 1118-1121 (D.C.Cir.1984) (plurality opinion) (although the

decision to undergo a psychiatric evaluation is a critical stage, the interview itself is not); *Commonwealth v. Trapp*, 423 Mass. 356, 358-359, 668 N.E.2d 327 (1996) (same); *State v. Wilson*, 26 Ohio App.2d 23, 28, 268 N.E.2d 814 (4th Dist.1971) (same).

{¶ 138} Finally, Whitaker questions the state's motives for Dr. West's psychiatric examination because she questioned him about the charges and conducted no testing of her own. He claims that Dr. West's only purpose was to interrogate him on behalf of the state to hurt the defense's case. But nothing in the record supports this allegation.

{¶ 139} Based on the foregoing, no plain error occurred, and we reject proposition of law No. IX.

*J. Exclusion of Whitaker's plea offer*

{¶ 140} In proposition of law No. XI, Whitaker argues that the trial court erred by refusing to allow evidence during mitigation of his offer to plead guilty in exchange for a sentence of life without parole.

{¶ 141} At trial, defense counsel argued that Whitaker's offer to plead guilty in exchange for a sentence of life without parole was relevant mitigating evidence showing his acceptance of responsibility and genuine remorse. The prosecutor argued that an offer to plead guilty is not mitigating evidence, because "it does not support any concept of remorse; it's an offer to avoid a potential penalty." The trial court ruled that such evidence was inadmissible as a mitigating factor.

{¶ 142} We have previously held, " '[A] defendant's offer to plead guilty, never accepted by the prosecutor, is not relevant to the issue of whether the defendant should be sentenced to death.' " *Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 130, quoting *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 69.

**{¶ 143}** Whitaker argues that *Sowell* and *Dixon* were wrongly decided; he claims that his offer to plead guilty was evidence of his character and his acceptance of responsibility and that it should have been admitted during mitigation. We disagree.

**{¶ 144}** In *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the United States Supreme Court held that in a capital case, the sentencer may not refuse to consider, as a matter of law, any relevant mitigating evidence. But "*Lockett* 'does not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes.' " *Owens v. Guida*, 549 F.3d 399, 419 (6th Cir.2008), quoting *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir.2005). Instead, "[f]ootnote 12 in *Lockett* explicitly stated that lower courts could continue to exclude as irrelevant evidence not bearing on the defendant's character, prior record, or the circumstances of the offense." *Owens* at 419.

**{¶ 145}** In *Owens*, the Sixth Circuit expressly rejected a defendant's claim that the offer to plead guilty was relevant mitigating evidence regarding the positive character trait of "acceptance of responsibility," stating:

> While "acceptance of responsibility" could be a reason for mitigation, Owens's proffered evidence shows no such acceptance. She did not offer to plead guilty unconditionally, which she could have done. Instead, she agreed to plead guilty only if guaranteed a life sentence in return. * * * [S]he was less interested in accepting responsibility and more interested in avoiding the electric chair, a motivation that is much less persuasive as a mitigating factor.

*Id.* at 420. Similar logic supports the trial court's denial of Whitaker's motion to introduce his offer to plead guilty during mitigation.

{¶ 146} Whitaker points out that other jurisdictions have allowed a defendant to present an offer to plead guilty in exchange for a life sentence as mitigating evidence. In *United States v. Fell*, 372 F.Supp.2d 773 (D.Vt.2005), the court held that the defendant's offer to plead guilty in exchange for a sentence of life imprisonment "bears on his acceptance of responsibility," *id.* at 784, and is admissible during mitigation, *id.* at 785. And in *Johnson v. United States*, 860 F.Supp.2d 663, 903 (N.D.Iowa 2012), the court held that defense counsel were deficient by not presenting evidence of the defendant's plea offer, because "it does have some bearing on the defendant's character and, more specifically, on the defendant's acceptance of responsibility for the charged offense." Also, in *Busso-Estopellan v. Mroz*, 238 Ariz. 553, 364 P.3d 472 (2015), ¶ 7, the Supreme Court of Arizona held that a defendant's offer to plead guilty is "relevant because it tends to make his acceptance of responsibility for the murders more probable." However, as discussed above, we reject the underlying premise (that the offer to plead guilty in exchange for life without parole shows acceptance of responsibility) of these cases.

{¶ 147} Whitaker also cites several United States Supreme Court decisions in arguing that the trial court's refusal to allow evidence of his offer to plead guilty violated his Sixth, Eighth, and Fourteenth Amendment rights, and Article I, Sections 9, 10, and 16 of the Ohio Constitution. First, Whitaker cites *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), in arguing that his due-process rights were violated. But *Sandstrom* involves burden-shifting instructions that have no relevance here. Next, Whitaker cites *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), which holds that a defendant has a Sixth Amendment right to have compulsory process for obtaining relevant and material witnesses in his favor. But that principle of law does not apply here, because Whitaker fails to show that he was denied the right to present relevant mitigating evidence. Finally, Whitaker cites *Hurst v. Florida*, 577 U.S.

92, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016), in arguing that the trial court usurped the jury's function as the finder of fact and gatekeeper of the death penalty when it refused to allow the jury to consider his offer to plead guilty. In *Hurst*, the United States Supreme Court held that Florida's capital-sentencing scheme violated the Sixth Amendment because it allowed a judge, rather than a jury, to make the findings necessary to impose the death penalty. *Hurst* does not apply to the issues presented here. None of these cases show that any of Whitaker's constitutional rights were violated by the trial court's refusal to admit evidence in mitigation that Whitaker made a pretrial offer to plead guilty in exchange for a life sentence.

{¶ 148} We conclude that the trial court did not err in excluding evidence that Whitaker offered to plead guilty in exchange for a sentence of life without parole. Accordingly, we reaffirm our holdings in *Dixon* and *Sowell*.

{¶ 149} Based on the foregoing, we reject proposition of law No. XI.

*K. Mercy as a mitigating factor*

{¶ 150} In proposition of law No. XII, Whitaker argues that the trial court erred by denying his request for an instruction on mercy during mitigation.

{¶ 151} We have held that "[p]ermitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner." *State v. Lorraine*, 66 Ohio St.3d 414, 417, 613 N.E.2d 212 (1993). Whitaker acknowledges *Lorraine*'s holding but argues that it should be overruled.

{¶ 152} Whitaker cites *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), and *Kansas v. Carr*, 577 U.S. 108, 136 S.Ct. 633, 193 L.Ed.2d 535 (2016), to support his claim. But neither of these cases involved this question nor held that an instruction on considering mercy in mitigation is required. And we have recently considered and rejected the same arguments. *See State v. Hundley*,

162 Ohio St.3d 509, 2020-Ohio-3775, 166 N.E.3d 1066, ¶ 122; *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 362.

{¶ 153} Because Whitaker has presented no meritorious justification for departing from this settled law, we reject proposition of law No. XII.

*L. Arguing the nature and circumstances of the offense*

{¶ 154} In proposition of law No. X, Whitaker argues that the prosecutor improperly argued that the jury should weigh the nature and circumstances of the offense as aggravating circumstances.

{¶ 155} "It is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' " *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996), paragraph two of the syllabus. However, "a prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance[s] outweigh mitigating factors." *State v. Sheppard*, 84 Ohio St.3d 230, 238, 703 N.E.2d 286 (1998). Thus, the prosecution "can describe the crime to prove the existence of the statutory aggravating circumstances." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 91.

{¶ 156} First, Whitaker challenges the following portion of the prosecution's mitigation-phase opening statement:

> [The prosecutor]: And that is what you're going to be asked to do when you retire to the jury room, is to engage in the weighing process, the aggravating circumstances of rape, kidnapping, aggravated burglary, and what was done to [A.D.] during those three crime specifications —
>
> [The defense counsel]: Objection.
>
> The court: Overruled.

[The prosecutor]: — versus any mitigation presented by defense counsel.

**{¶ 157}** Whitaker argues that the prosecutor improperly told the jury to consider "what was done to [A.D.]" as an aggravating circumstance. But Whitaker had been found guilty of three aggravating circumstances, including aggravated murder while kidnapping A.D. and aggravated murder during the rape of A.D. Thus, the prosecutor's remarks were focused on the nature and circumstances of the aggravating circumstances and were proper. *See Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, at ¶ 125.

**{¶ 158}** Next, Whitaker challenges the following statements made during the prosecutor's rebuttal in mitigation:

[The prosecutor]: And after you've given them the weight, those mitigating factors, Mr. Shaughnessy asked you to close your eyes.

Well, close your eyes and think about those aggravating circumstances. How long are those aggravating circumstances going to stay in your heads? How long are you going to see — or how much weight are you going to have of that rape of [A.D.]? What does that deserve? What kind of weight does that deserve?

How much weight, when you sit there with your eyes closed, does that slow cutting of her neck get? Eight times across her neck. The smaller ones right below the neck. The stab wounds in her back. How much weight does that get?

[The defense counsel]: Your Honor, objection.

Your Honor, I apologize, but objection.

The court (to the prosecutor): Go ahead.

{¶ 159} Whitaker argues that these comments improperly urged the jurors to focus on the nature and circumstances of the offense when deciding how much weight to give the aggravating circumstances. Both parties have latitude in responding to arguments of opposing counsel. *See State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 200. Thus, the prosecutor could request that the jurors close their eyes and think about the aggravating circumstances in response to defense counsel's request that the jurors do the same in considering Whitaker's dismal life in prison if sentenced to life without parole.

{¶ 160} The prosecutor also did not tell the jurors that the number of knife wounds inflicted on A.D. was an aggravating circumstance. Instead, the prosecutor suggested that the jury could take into consideration the number of wounds inflicted during the crime. This is not an improper statement of the law. *See State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 101-104 (the prosecutor's remarks to the jury were proper when, in describing the force used to commit the crime, he asked jurors to consider that the defendant put eight holes in the victim's head).

{¶ 161} Even if any of the prosecutor's comments had been improper, Whitaker cannot show prejudice, because the trial court correctly instructed the jury on the aggravating circumstances and the proper standard to apply in the weighing process. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 147. It is presumed that the jury followed the court's instructions. *State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994).

{¶ 162} Based on the foregoing, we reject proposition of law No. X.

*M. Ineffective assistance of counsel*

{¶ 163} In proposition of law No. XIV, Whitaker makes generalized claims regarding ineffective assistance of counsel, and he argues that if this court

determines that any issues previously raised were not preserved for review, then he was denied the effective assistance of counsel.

**{¶ 164}** As discussed earlier, to prevail on a claim of ineffective assistance of counsel, Whitaker must show that counsel's performance fell below an objective standard of reasonableness and, in addition, that prejudice arose from counsel's performance. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 165}** Although Whitaker makes specific arguments in support of his claims of ineffective assistance of counsel in connection with proposition of law No. V, as indicated earlier in this opinion, he fails to cite any specific acts by defense counsel that he contends violated his Sixth Amendment right to effective assistance of counsel in connection with proposition of law No. XIV. Thus, in regard to this proposition, Whitaker fails to meet his burden that there is a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373, quoting *Strickland* at 694; *see also State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000) (failure to specify any instances of ineffective assistance does not meet the *Strickland* standard). We reject proposition of law No. XIV.

### *N. Consecutive sentences*

**{¶ 166}** In proposition of law No. XV, Whitaker argues that when a defendant has received a death sentence, a trial court errs by imposing consecutive sentences for the noncapital counts. But because Whitaker failed to object to the imposition of consecutive sentences at the sentencing hearing, he has forfeited this issue, absent plain error. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 152.

**{¶ 167}** To impose consecutive sentences, a trial court must make findings on the record that consecutive sentences are "necessary to protect the public from future crimes or to punish the offender and that consecutive sentences are not

disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C. 2929.14(C)(4). The court must also find that at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, and was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*Id.*

{¶ 168} In *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37, we held that the trial court must make the requisite findings before imposing consecutive sentences "at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings."

{¶ 169} The trial court in this case imposed consecutive sentences for Count 5 (rape), Count 6 (kidnapping by force, threat, or deception for purpose of terrorization), Count 7 (kidnapping for purpose of engaging in sexual activity with

A.D. against her will), Count 8 (aggravated burglary), Count 9 (tampering with evidence), and Count 10 (abusing a corpse) for a total of 48 years.

{¶ 170} In its judgment entry, the trial court made the following findings, which complied with R.C. 2929.14(C)(4):

> The court imposes prison terms consecutively finding that consecutive sentences are necessary to protect the public from future crime and/or to punish defendant; that the consecutive sentences are not disproportionate to the seriousness of defendant's conduct and to the danger defendant poses to the public; and that, at least two of the multiple offenses were committed in this case as part of one or more courses of conduct, and the harm caused by said multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of defendant's conduct, or defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by defendant.

The trial court made similar findings at the sentencing hearing.

{¶ 171} Whitaker argues that because of his death sentence, the trial court's finding that consecutive sentences are necessary to protect the public from future crimes is nonsensical and violates R.C. 2929.14(C)(4). But no Ohio statute prohibits the imposition of consecutive sentences in capital cases, and Whitaker provides no legal support for his argument that a court may not impose consecutive sentences if it also imposes the death sentence. *See Grate*, 162 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, at ¶ 209.

{¶ 172} Based on the foregoing, we reject proposition of law No. XV.

*O. Cumulative error*

**{¶ 173}** In proposition of law No. XVI, Whitaker argues that this court should reverse his convictions and sentences based on the doctrine of cumulative error.

**{¶ 174}** Under the doctrine of cumulative error, we will reverse a conviction when the cumulative effect of errors deprives a defendant of a fair trial even though each instance of trial-court error does not individually constitute cause for reversal. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223; *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

**{¶ 175}** The doctrine of cumulative error is not applicable in this case. Whitaker received a fair trial. Moreover, none of the improper victim-impact evidence that was presented, when considered either individually or cumulatively, resulted in prejudicial error. As previously discussed, overwhelming evidence was presented that established Whitaker's guilt in regard to each conviction, other than the aggravated-burglary conviction. *See Powell* at ¶ 224. We reject proposition of law No. XVI.

*P. Supreme Court of Ohio's proportionality review*

**{¶ 176}** In proposition of law No. XIX, Whitaker argues that this court's proportionality review under R.C. 2929.05(A) should include, at a minimum, all cases in which the indictment included a death-penalty specification under R.C. 2929.04(A) in order to comport with the clear language of the statute, provide due process and a meaningful appeal, and avoid the imposition of cruel and unusual punishment.

**{¶ 177}** The Eighth Amendment does not require a court to conduct a comparative proportionality review of death sentences. *Pulley v. Harris*, 465 U.S. 37, 50-51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, R.C. 2929.05(A) requires us to conduct a proportionality review of all death sentences: "In

determining whether the sentence of death is appropriate, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." We have held that "R.C. 2929.05 does not require a comparison of sentences in non-capital murder cases for proportionality review." *State v. Jenkins*, 15 Ohio St.3d 164, 209, 473 N.E.2d 264 (1984).

{¶ 178} In *State v. Steffen*, 31 Ohio St.3d 111, 123, 509 N.E.2d 383 (1987), we held, "[T]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." In explanation of this holding, we stated:

> We are further persuaded that a court cannot make a meaningful proportionality review unless the pool of cases is restricted to those which the reviewing court itself has decided. Comparison with cases not passed upon by the reviewing court would be unrealistic since the reviewing court could not possess the requisite familiarity with the particular circumstances of such cases so essential to a determination of appropriateness.
>
> * * * No reviewing court need consider any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not.

(Citation omitted.) *Id*. at 123-124.

{¶ 179} We have rejected recent requests to reconsider this court's interpretation of R.C. 2929.05(A) with respect to the scope of proportionality review. *See, e.g.*, *Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 151; *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754,

¶ 140-142. In addition, we have continued to reject the claim that proportionality requires an analysis of all indictments charging capital specifications, as opposed to only cases in which the death penalty was imposed. *See State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 183.

{¶ 180} Whitaker also argues that the proportionality reviews by the North Carolina and Tennessee Supreme Courts are examples of the way review should be meaningfully conducted in Ohio. But the fact that North Carolina and Tennessee have different methods of review does not show that our proportionality review is inadequate or in any way inconsistent with R.C. 2929.05(A).

{¶ 181} Based on the foregoing, we reject proposition of law No. XIX.

*Q. Constitutionality*

**1. Right to plead guilty with a jury making the sentencing determination**

{¶ 182} In proposition of law No. XVIII, Whitaker argues that Ohio law is unconstitutional because it does not allow a capital defendant to plead guilty and have a jury make the sentencing determination. He argues that he has a constitutional right to have a jury determine the existence of any mitigating factors and to determine whether the aggravating circumstances outweigh the mitigating factors under *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, *Ring*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, and *Hurst*, 577 U.S. 92, 136 S.Ct. 616, 193 L.Ed.2d 504.

{¶ 183} We rejected the same arguments in *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 50-61. Moreover, the United States Supreme Court recently held in *McKinney v. Arizona*, __U.S.__, __, 140 S.Ct. 702, 707, 206 L.Ed.2d 69 (2020), that "a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision." We reject proposition of law No. XVIII.

**2. Violation of *Hurst v. Florida***

**{¶ 184}** In proposition of law No. XX, Whitaker argues that Ohio's capital-sentencing procedures violate the Sixth Amendment right to a jury trial as construed in *Hurst*. We rejected this claim in *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56, ¶ 21. And although Whitaker asks this court to overturn *Mason*, his arguments are similar to those that were raised and rejected in *Mason*. Based on the foregoing, we reject proposition of law No. XX.

**3. Ohio's death-penalty statutes**

**{¶ 185}** In proposition of law No. XXI, Whitaker challenges the constitutionality of Ohio's death-penalty statutes and claims that the statutes violate international law and treaties to which the United States is a party. We have previously rejected the same arguments, *see, e.g.*, *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 279-280, and do so again here.

**IV. INDEPENDENT SENTENCE EVALUATION**

**{¶ 186}** Having considered Whitaker's propositions of law, we must now independently review Whitaker's death sentence for appropriateness and proportionality as required by R.C. 2929.05(A).

*A. Aggravating circumstances*

**{¶ 187}** Whitaker was convicted of murdering A.D. while committing or attempting to commit rape and while committing or attempting to commit kidnapping, all in violation of R.C. 2929.04(A)(7).

**{¶ 188}** The evidence at trial supports the jury's findings of guilt as to those two aggravating circumstances. The evidence showed that on the morning of January 26, 2017, Whitaker forcibly entered a vacant house with 14-year-old A.D., where he raped her and then killed her with a power drill, screwdriver, and other tools.

**{¶ 189}** The discovery of A.D.'s body at the Fuller Avenue house, Whitaker's bloody boot prints at the crime scene, his DNA in A.D.'s vagina and on

54

her labia, his confessions, and the coroner's testimony established Whitaker's guilt of the death-penalty specifications.

*B. Mitigating evidence*

**{¶ 190}** Against these aggravating circumstances, we must weigh the mitigating factors set forth in R.C. 2929.04(B). In mitigation, Whitaker presented testimony from five witnesses and made an unsworn statement.

### 1. Mary Cecil McDonnell

**{¶ 191}** Mary Cecil McDonnell, a licensed independent social worker and the defense mitigation specialist, discussed Whitaker's background, social history, and themes in his life.

*a. Whitaker's upbringing and education*

**{¶ 192}** Whitaker was born in a small, rural town in Tennessee. His parents never married or lived together, and he saw his father only intermittently. Whitaker had a closer relationship with his paternal grandparents, who lived in the same town as he did. Both of them were important figures in Whitaker's life. Whitaker had six older siblings. McDonnell testified that Whitaker's oldest sister, Lisha Summers, told her that Whitaker had a normal birth and "met all of his developmental milestones at the appropriate time." And both Summers and Whitaker told McDonnell that Whitaker had never been "physically abused or sexually abused or neglected."

**{¶ 193}** Whitaker's mother died following a long illness when he was eight years old. After his mother's death, Whitaker and his siblings moved to Cleveland. Summers, who was 19 years old at the time, obtained guardianship of the children and began serving as Whitaker's de facto mother. Summers, the siblings' Aunt Martha, and Martha's sister, Ruth King, were "part of the kinship network" that helped raise Whitaker. The family struggled financially, and there was not a lot of food at times.

{¶ 194} Summers's boyfriend, Michael McDonald, also lived with the family in Cleveland. But McDonald developed a heroin addiction. He became violent toward Summers, and Whitaker watched him beat her. McDonald, a large man, was also cruel to Whitaker and made awful and demeaning comments to him.

{¶ 195} Whitaker attended Cleveland public schools until the fourth grade. The family moved to Garfield when he was in the fifth grade. He dropped out of high school in the tenth grade. Whitaker was once suspended from school for fighting. There is no record that he had any significant learning disabilities.

{¶ 196} McConnell stated that Whitaker has never been diagnosed with a mental illness or treated for any psychological issues. In addition, there is no evidence that he suffered from a traumatic brain injury or that he has a history of seizures or neurological disorders.

### b. Drug use

{¶ 197} Whitaker began smoking marijuana at age 15 and began smoking marijuana heavily when he was 16. Whitaker also began using crack and cocaine in his early 20s. He continued to smoke marijuana and use crack and cocaine until his incarceration. Whitaker underwent drug detoxification during a 28-day inpatient treatment in 2000.

### c. Criminal history

{¶ 198} In 1996, Whitaker pled no contest to assault. That same year, Whitaker pled guilty to criminal trespass. His sentence of 30 days was suspended. In 1999, Whitaker pled guilty to grand theft of a motor vehicle and burglary. He was sentenced to community sanctions for two years, which he repeatedly violated by testing positive for drugs. In 2000, he was sentenced to eight months in prison for violating community-control sanctions by testing positive for drug use. In 2005, Whitaker pled guilty to sexual battery and felonious assault and was sentenced to four years in prison; he was also found to be a sexually oriented offender. In 2012, Whitaker pled guilty to theft and aggravated theft and was sentenced to six months

in jail and two years of community control, which he violated by testing positive for drug use and was sentenced to six months in jail. In 2017, he pled no contest to disorderly conduct and was placed on probation.

### d. Relationships

{¶ 199} Whitaker has a son and three daughters with four different women.

### e. Themes from Whitaker's life

{¶ 200} McDonnell identified several themes from Whitaker's life. First, the death of Whitaker's mother resulted in a profound sense of helplessness and hopelessness. At the same time, his family moved from Tennessee to Cleveland, which deprived him of his ability to have contact with his father and paternal grandparents. Second, Whitaker was traumatized by witnessing domestic violence against Summers. McDonald also verbally and emotionally abused Whitaker. McDonnell opined that this experience "affect[ed] the way [Whitaker] looks at his ability to * * * function in the world [and] solve problems." Third, according to McDonnell, Whitaker's history of drug abuse affected his inhibitions and "particularly with cocaine and stimulating drugs, people often become violent, particularly over extended use."

### 2. James Summers

{¶ 201} James is Whitaker's older brother by about six years. According to James, Whitaker always "hung around [his] mother [when] he was young." But Whitaker "went into a shell" after their mother died and the family moved to Cleveland.

{¶ 202} James stated that Summers and McDonald fought all the time and that Whitaker saw McDonald physically and verbally abuse her. Whitaker became involved in drug-related activity as a teenager. Whitaker did not have any positive male role models, because James was selling drugs during that time and their father was not around or involved with their lives.

{¶ 203} Whitaker and James lived together for a few months as adults. James got Whitaker a landscape-construction job for a "good year, year and a half." But Whitaker sometimes missed work because of his drug use. On occasion, Whitaker asked for money from James and other family members, and they tried to take care of him. But James believes that the family "turned a blind eye" to Whitaker's drug use.

### 3. Lisha Summers

{¶ 204} Summers described Whitaker's mother as a "good mom" who did "the best she could for all of us." Whitaker was very close to his mother. After their mother became sick, Summers went to work, fixed dinner, and took care of the family. Following their mother's death, Summers moved the family to Cleveland to avoid separating the family members. Summers worked at a day-care center and "life was kind of rough, but it was family." Whitaker "seemed to handle" things well, but he was always quiet.

{¶ 205} McDonald, Summers's boyfriend, who lived with the family, started to use drugs and abuse Summers after the move. When Whitaker was eight or nine years old, he witnessed McDonald give Summers black eyes and a busted lip. After living with the family for about a year, McDonald returned to Tennessee.

{¶ 206} Summers stated that she provided a loving home for Whitaker and his siblings. She said, "With Auntie Martha and then my other siblings, I'd say we raised each other." She stated that Whitaker was a very smart child and that he did well in school. Summers never saw Whitaker use drugs and believes she was in denial about his drug use.

{¶ 207} Summers saw less and less of Whitaker as he grew older, and she believes that was due to his drug use. But Summers said that Whitaker helped their Aunt Martha after she was hurt. He helped her dress and wash her hair when she was unable to raise her arm.

### 4. Dr. Robert Kaplan

{¶ 208} Dr. Robert Kaplan, a clinical and forensic psychologist, identified the following mitigating factors.

#### a. Witnessing violence against his sister

{¶ 209} Dr. Kaplan opined that "due to witnessing violence against his sister at an early age, Mr. Whitaker learned to repress feelings of anger and developed a maladaptive coping system dissociation." He described dissociation as the "process of blocking feelings out of your mind * * * even your perceptions out of your mind." According to Dr. Kaplan, dissociation "prevented [Whitaker] from being aware of negative emotions until they reached a point that they disrupted his capacity to control them and conform his behavior to the requirements of the law." And Dr. Kaplan added that "in the psychological testing that I had administered to Mr. Whitaker * * * the degree of dissociation is extreme. In fact, he's maybe less than two points below people who actually do have split personalities."

{¶ 210} As for the murder, Dr. Kaplan believed that the "actual act of the violence that he committed against the victim was a manifestation of this repressed anger that just suddenly overwhelmed him." Whitaker told Dr. Kaplan that he recalled having sex with A.D., but he could not recall the act. Thus, "it was more a reactive type [of] behavior than a planned or a cunning type of event." Dr. Kaplan concluded that Whitaker "lacked the capacity to control his behavior due to a combination of dissociation and intoxication by cocaine."

#### b. Mother's death

{¶ 211} Dr. Kaplan stated that as a result of losing his mother and witnessing domestic violence at an early age, Whitaker developed the following problems: "[b]ed wetting; school behavior problems; rebelliousness and optional behavior; decreased capacity for empathy; reduced ability to control his impulses; [and] devaluation of women and substance abuse."

{¶ 212} Whitaker devalued women after his mother died and after he witnessed his sister being beaten. He began to view women as "helpless" and as people who "don't really count." Dr. Kaplan stated that Whitaker became a womanizer. "He never really developed the capacity to have a long-term intimate relationship with people. And again, this is due to * * * these events that happened in his life." And the absence of a loving mother affected his ability to have empathy for other individuals.

### c. Lack of a positive male role model

{¶ 213} Whitaker also lacked a positive male role model who could inspire self-discipline or values that could lead to achievement and better self-control. He was taken from his father at an early age after losing his mother. No other man in Whitaker's life stepped in as a positive male role model. Even his brothers had substance-abuse and criminal problems. Thus, Whitaker turned to gangs and other individuals as his role models.

### d. Move from Tennessee to Cleveland

{¶ 214} Dr. Kaplan stated that after the move from a small town in Tennessee to Cleveland, "[Whitaker] and his family were subject to a lot of racist treatment and suffered financial hardship. These stressors affected his psychological development and capacity to regulate his behavior."

### e. Sister's cancer diagnosis

{¶ 215} In 2016, Summers developed brain cancer. Dr. Kaplan opined that her illness was an "additional stressor" that contributed to Whitaker's inability to control himself.

### f. Combination of factors leading to Whitaker's actions

{¶ 216} Dr. Kaplan opined that a combination of factors led to Whitaker's actions.

Had it not been for the death of his mother at an early age in his life, the lack of a positive male role model in his life, and witnessing domestic violence against his sister, Mr. Whitaker's life would have taken a different direction and he would not currently be facing capital murder charges.

I'm pretty certain that if these three things didn't happen, if any of these three things didn't happen, we wouldn't be here.

### g. Cocaine use

**{¶ 217}** Dr. Kaplan stated that "[a]t the time the offenses occurred, Mr. Whitaker was under the influence of cocaine, which impaired his ability to control his impulses and conform his behavior to the requirements of the law." Test scores showed that Whitaker has clinically significant problems with substance abuse.

### h. Prison records

**{¶ 218}** Dr. Kaplan testified that Whitaker's prison records from the last time that he was incarcerated showed that he had made "a sincere effort to reform himself by participating in a drug treatment and anger management programs." He had also participated in GED classes. Dr. Kaplan stated that Whitaker completed mandatory sex-offender treatment and "a deniers program," which helps an inmate to recognize that his actions were criminal and to accept responsibility for those actions. Whitaker achieved the following goals:

He admitted his guilt for the crime. He accepted responsibility for the crime and victimization. He demonstrated empathy for the victim and other people. He identified what led up to — the factors that led up to the offense. He demonstrated coping skills that would help him prevent relapse and manage his behavior.

{¶ 219} Prison records showed some minor disciplinary problems. Whitaker was once found with marijuana. But he attended classes and teachers said that Whitaker had a good attitude. Whitaker received good performance ratings for his job in food service and in the recreation department. His plan for reentering society following completion of his prison term mentioned that he needed employment education, work on marital-family relations, and continuing support for substance-abuse problems. Nonetheless, it was believed that Whitaker had the right attitude to go back into society.

### i. No risk to other inmates or guards if sentenced to life in prison

{¶ 220} Whitaker refrained from violent behavior in prison and while awaiting trial, and he was never considered a "violence risk" in the prison system. Dr. Kaplan testified that this information showed that if Whitaker is "put away for the rest of his life * * * it's not likely that he's going to be a risk to other inmates or to the guards."

### j. No antisocial personality disorder, no paraphilic or pedophilic disorders, and no preexisting desire for sexual relations with adolescent females

{¶ 221} Dr. Kaplan stated that Whitaker is a "very troubled man" with "very serious problems" but he is "not a psychopath." Dr. Kaplan did not diagnose Whitaker with an "antisocial personality disorder because he has no history of a conflict disorder before the age of 15."

{¶ 222} Dr. Kaplan testified that the *DSM-5* shows that Whitaker does not qualify for a diagnosis of any paraphilic disorder (difficulty in controlling sexual impulses, voyeurism, flashers, etc.), including a pedophilic disorder (sexual attraction to young children).

{¶ 223} Testing showed that Whitaker "doesn't have sexual obsessions" or "deviant sexual values." He has "traditional sexual values." Dr. Kaplan added, "There's no history in any of the records that I viewed or * * * [from] any of the people interviewed by Miss McDonnell, that showed any attraction to adolescent

girls." Dr. Kaplan opined, "This was an aberrant situation. * * * [H]e's not someone who normally tries to flirt with younger girls, adolescent girls. He is not someone who tries to pick them up. * * * This is a very unusual event."

### k. Remorsefulness

{¶ 224} Finally, Dr. Kaplan testified that Whitaker is remorseful for these crimes. He stated that "[t]he dissociation makes it difficult because — since he can't remember the actual violence * * * he knows he did it, but he can't believe he did it." Dr. Kaplan explained:

> [A] conscious part of [Whitaker's] mind is willingly admitting that he did this and he's accepting that he's responsible for this. But the unconscious part of his mind, he still can't believe he did it. It's so horrific to him that he can't process that right now. And in fact, when he does come to his conscious awareness, he becomes depressed and even suicidal.

{¶ 225} Dr. Kaplan opined that Whitaker's failure to believe he could commit these offenses makes him "tell everyone in his family, everyone that he knows, * * * how can they say I did this, they have to prove it beyond a reasonable doubt." Dr. Kaplan stated that many times defendants will accept responsibility within the legal system but make a denial to family members. Thus, Whitaker tells friends and family members, "I didn't do it," to keep their support.

### l. Cross-examination

{¶ 226} During cross-examination, Dr. Kaplan stated that Whitaker initially denied any recollection of the events but that Whitaker later stated that he was under the influence of drugs and A.D. had wanted to have sexual relations with him. Whitaker later retracted the statement that it was consensual sex.

### 5. James E. Aiken

**{¶ 227}** James Aiken, a prison-confinement consultant, discussed Whitaker's potential adjustment to prison life, should he be sentenced to life without possibility of parole. Aiken stated that Whitaker's vulnerability level in prison is very high, because he is older (45 years old at the time of sentencing), he is a sex offender, and he murdered a child. Whitaker is also a member of a prison gang, the Gangster Disciples, which heightens his risk in prison. Aiken testified that if he were a warden, he would not place Whitaker in the general prison population and that Whitaker would be safer on death row than in the general prison population.

**{¶ 228}** Aiken concluded that Whitaker can be managed and that he does not present an unusual risk of harm to staff or other inmates while "properly confined in the proper security level." He opined that "the prison system can adequately address Whitaker's security needs from here until he dies."

### 6. Whitaker's unsworn statement

**{¶ 229}** Whitaker made the following unsworn statement:

From the beginning I've accepted full responsibility for my actions.

I assisted the detectives as to where to find my clothes and boots I was wearing that day.

I never wanted this to happen, and ever since that day I've been feeling regret and remorse.

Through the year I made a lot of phone calls, and in those calls I've said things, a lot about things in order to protect my family's feelings.

I've admitted to my guilt to the detectives and to my lawyers.

I asked my lawyers not to contest or challenge anything in this case because I really wanted [A.D.'s] family to have closure.

I will not try to hide behind drugs or alcohol. I will not pretend or lie because it wouldn't be fair to the family.

I apologize to the family and the community for my actions. There is no excuse for what I've done.

I can't imagine the pain the family feels, but I know the pain I feel when I had to look at what I've done.

If I could go back to that day in January, I'd change everything, but I can't, so I have to live with each day with the shame, hurt and guilt.

And although the trial is over, the regret and painful memories will remain with me. Just that's sometimes — that's just things I can't shake.

I pray that the family can find peace and she can find rest.

### C. State's rebuttal: Dr. Sara West

{¶ 230} Dr. Sara West, a forensic psychiatrist, interviewed Whitaker and reviewed Dr. Kaplan's report. She stated that Dr. Kaplan's testing, in her opinion, actually "indicated a low probability for dissociation." Dr. West also stated that Whitaker did not mention witnessing domestic violence when she interviewed him. She testified that Whitaker's time frame for his dissociation changed over the course of his statements to the police and added, "Although anything is possible, it's highly unlikely that [dissociation] would occur." She also testified that the evidence suggests that Whitaker did not black out at the time of the offense.

{¶ 231} Dr. West stated that it would be incredibly difficult to determine that Whitaker would not be facing capital punishment if any one of three things (loss of his mother at an early age, witnessing domestic violence, lack of a positive

male role model) had not occurred, because "every event in everyone's life shapes who they are."

{¶ 232} Dr. West testified that Whitaker's statements were the only evidence that he was high on cocaine at the time of the offense; nothing in police reports supports that conclusion. Dr. West also disputed Whitaker's remorsefulness, noting that Whitaker told someone on a phone call from jail that "he would have no remorse for the events should he be released from incarceration." In reference to his possible release from jail, Whitaker said, "[W]hen I come walking out of this m* * *f* * *, I am going to tell everyone to kiss my * * *. I ain't going to show no remorse, no nothing." And as for the victim, Whitaker said, "I kept telling everybody that I never came in contact with this girl."

{¶ 233} In discussing her own report, Dr. West testified that Whitaker has no notable psychiatric history. She explained, "Mr. Whitaker did not report any * * * psychotic symptoms. And the way he interacted with me during the interview did not suggest he was experiencing any psychosis." Dr. West added that Dr. Koblentz, the jail psychiatrist, also "diagnosed Mr. Whitaker with 'no current psychiatric diagnoses on Axis I,' * * * the listing point for all major psychiatric diagnoses," shortly after Whitaker was booked into the county jail.

{¶ 234} Dr. West diagnosed Whitaker with an "other specified personality disorder," saying that he met the criteria for antisocial personality disorder but had not been diagnosed before age 15, and a cocaine-use disorder in a controlled environment.

*D. Sentence evaluation*

{¶ 235} Nothing in the nature and circumstances of the offenses is mitigating. Whitaker forcibly entered a vacant house with A.D. and then raped, tortured, and murdered her with a power drill and other tools. He dragged A.D.'s body into another room and then fled the scene. These are horrific crimes that lack any mitigating features.

**{¶ 236}** The statutory mitigating factors include R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); (B)(4) (youth of the offender); (B)(5) (lack of a significant criminal record); (B)(6) (the offender was an accomplice only); and (B)(7) (any other relevant factors). Review of the evidence shows that none of these statutory factors is applicable here except R.C. 2929.04(B)(7).

**{¶ 237}** First, according to Dr. Kaplan, Whitaker's problems underlying these offenses may be traced to his early-life experiences. Whitaker experienced a disruptive childhood. His mother died when he was young, and his sister moved the family from a small town in Tennessee to Cleveland. Whitaker was traumatized by watching his sister's boyfriend beat and abuse her. He also lacked a positive male role model during these difficult times. Such evidence is entitled to weight under R.C. 2929.04(B)(7) but not decisive weight. *See Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 276; *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 265 (decisive weight seldom given to unstable backgrounds).

**{¶ 238}** Second, Whitaker suffers from mental-health problems. Dr. Kaplan testified that due to witnessing violence against his sister, Whitaker learned to repress his feelings of anger and developed "a maladaptive coping system dissociation." Dr. Kaplan opined that dissociation disrupted Whitaker's capacity to control his negative emotions and conform his behavior to the requirements of the law. But Dr. West disputed these findings, stating that the results of testing indicated "a low probability for dissociation" and that its occurrence was highly unlikely. Under these circumstances, Dr. Kaplan's testimony is not entitled to conclusive significance. *See State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.2d 716, ¶ 174-175 (dissociative disorder ascribed little weight in mitigation).

**{¶ 239}** Whitaker was described by Dr. Kaplan as a "very troubled man." Whitaker could not be diagnosed with an antisocial personality disorder, because he had no history of a conflict disorder before age 15. However, Dr. West diagnosed Whitaker with an "other specified personality disorder." We give weight to Whitaker's personality disorder and other mental-health problems under R.C. 2929.04(B)(7). *See State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 296.

**{¶ 240}** Third, Dr. Kaplan and Whitaker's family members testified that Whitaker suffered from substance-abuse problems. Dr. Kaplan stated that Whitaker was high on cocaine at the time of the offenses. But Dr. West testified that Whitaker's own statement was the only evidence that he was high on cocaine at the time of the offenses. Nonetheless, Whitaker's history of substance abuse is entitled to some weight. *See State v. Tibbetts*, 92 Ohio St.3d 146, 174, 749 N.E.2d 226 (2001).

**{¶ 241}** Fourth, we give weight to the love and support that he has from family members. *See State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 301.

**{¶ 242}** Fifth, Dr. Kaplan and Aiken testified that Whitaker would adjust to prison life. Such evidence is entitled to weight under R.C. 2929.04(B)(7). *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 200. But the weight accorded to such evidence is tempered by testimony about Whitaker's membership in a prison gang.

**{¶ 243}** Sixth, Whitaker expressed remorse and responsibility for his crimes during his trial. But these claims are undermined by Whitaker's calls to friends and family members from jail in which he indicated otherwise. *See Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 192. Dr. Kaplan testified that many times defendants will accept responsibility with the legal system and make a denial to friends and family members to keep their support. In the end, this factor

is entitled to some weight. *See State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 185.

**{¶ 244}** As detailed above, Whitaker presented substantial mitigating evidence that is entitled to considerable weight. That said, Whitaker raped and murdered 14-year-old A.D. in a vacant house. He then fled the scene and was arrested only after DNA evidence identified him as the perpetrator. Under these circumstances, we conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

### E. Proportionality

**{¶ 245}** Having determined that the aggravating circumstances outweigh the mitigating factors, we must also decide whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A).

**{¶ 246}** We find that the death sentence imposed in this case is appropriate and proportionate to death sentences upheld in similar cases. We have also upheld the death penalty for aggravated murder during a rape under R.C. 2929.04(A)(7). *See Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 207; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196. And we have upheld the death sentence for aggravated murder during a kidnapping. *See State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 148; *State v. Hartman*, 93 Ohio St.3d 274, 306, 754 N.E.2d 1150 (2001).

**{¶ 247}** Accordingly, we affirm Whitaker's convictions and sentence of death. We vacate only the portion of the judgment finding Whitaker guilty of aggravated burglary, and we remand the cause to the trial court for a corrected sentence reflecting our vacation of the aggravated-burglary conviction and the finding of guilt on Count 3 and our dismissal of the death-penalty specifications predicated on aggravated burglary.

Judgment affirmed in part,

vacated in part, and

reversed in part

and cause remanded.

O'CONNOR, C.J., and KENNEDY, DEWINE, DONNELLY, and STEWART, JJ., concur.

BRUNNER, J., concurs, with an opinion.

_____

**BRUNNER, J., concurring.**

**{¶ 248}** I agree that the convictions and death sentence of appellant, Christopher Whitaker, should be affirmed. I write separately because I disagree with the majority on the issue raised in proposition of law No. XI—whether the trial court erred by refusing to allow evidence of Whitaker's offer to plead guilty in exchange for a sentence of life without parole to be considered during mitigation. In my view, Whitaker's plea offer is relevant mitigation evidence and should have been admitted.

**{¶ 249}** R.C. 2929.04(B) describes the mitigating factors the jurors were to consider during the sentencing phase of Whitaker's trial. In relevant part, it required them to consider "the nature and circumstances of the offense [and] the history, character, and background of the offender," plus an additional seven factors, the last of which is a catchall provision that required consideration of "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death," R.C. 2929.04(B)(7). R.C. 2929.04(C) then states that "[t]he defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death."

**{¶ 250}** Notwithstanding the broad nature of these provisions, we have held that "the trial court can exclude evidence that is not relevant to the jury's sentencing decision." *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 67. The question of relevance in the mitigation phase of a capital trial is governed

by the Rules of Evidence, and whether to admit evidence under those rules lies within the sound discretion of the trial court. *Id.*

{¶ 251} During the mitigation phase, Whitaker sought to introduce evidence that he had offered to plead guilty in exchange for a sentence of life in prison without parole. His counsel argued that the offer was relevant as mitigation evidence because it showed his acceptance of responsibility and genuine remorse. The trial court ruled that the evidence was inadmissible, however, and this court agrees.

{¶ 252} In my view, Whitaker's plea offer was relevant mitigation evidence. Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Whitaker's offer can be viewed as making it more likely that he accepted responsibility for his crimes. Acceptance of responsibility is mitigating because it reflects positively on his "character," a factor the jury was required to consider under the main paragraph of R.C. 2929.04(B). It also falls within the catchall provision of R.C. 2929.04(B)(7), as it is "relevant to the issue of whether the offender should be sentenced to death." Counsel for the state even conceded at oral argument that it is possible that a reasonable juror may find Whitaker's offer mitigating under R.C. 2929.04(B).

{¶ 253} I find it particularly compelling that Whitaker made his acceptance of responsibility a central theme of his case before the jury. During voir dire, for example, his attorney emphasized to potential jurors that Whitaker had taken responsibility for his actions: "I want to tell you something else. We're not contesting liability in this case. Mr. Whitaker is responsible for taking the life of this child. * * * [T]hat is information that you need to have right now." Counsel relied on this theme again in their opening statement:

[A]t Mr. Whitaker's direction * * * I'm standing here today telling you * * * we're not contesting that. We're not contesting that he did it.

We're not contesting that he's taking responsibility for the awful things that you saw in here in opening statement, the awful things you saw on the jury view, and unfortunately the awful things you're about to see over the next several days.

Whitaker's attorneys continued to maintain this approach even at the conclusion of the trial. During closing arguments, counsel stated:

Look, at the outset of this case, during voir dire, we came to you, we waved that white flag and we told you we're not challenging whether or not he's responsible for taking her life.

There's nothing in this world that could justify the events that occurred in this case.

There may be explanations as to what occurred, but we still stand by no justifications and no excuses. And he knows that, which is the reason why he said during the course of that interview, he did not want a circus. He acknowledged his wrongdoing and said give me my time, or what I deserve.

The reason for defending Mr. Whitaker in this manner which we have, but we're not challenging witnesses and the evidence, because he required it.

Mr. Shaughnessy and I feel like fish out of water.

It's counterintuitive not to challenge witnesses, not to challenge their credibility. But in this case we're required to follow our client's instructions. And it's the right thing to do. It really is

72

in this case. And I'm glad that Mr. Whitaker gets that. We cannot defend him in this way without his approval.

Acceptance of responsibility likewise remained a defense theme during the mitigation phase. In his unsworn statement, Whitaker said:

> From the beginning I've accepted full responsibility for my actions.
>
> I assisted the detectives as to where to find my clothes and boots I was wearing that day.
>
> I never wanted this to happen, and ever since that day I've been feeling regret and remorse.
>
> Through the year I made a lot of phone calls, and in those calls I've said things, a lot about things in order to protect my family's feelings.
>
> I've admitted to my guilt to the detectives and to my lawyers.
>
> I asked my lawyers not to contest or challenge anything in this case because I really wanted the DeFreeze family to have closure.
>
> I will not try to hide behind drugs or alcohol. I will not pretend or lie because it wouldn't be fair to the family.
>
> I apologize to the family and the community for my actions. There is no excuse for what I've done.
>
> I can't imagine the pain the family feels, but I know the pain I feel when I had to look at what I've done.
>
> If I could go back to that day in January, I'd change everything, but I can't, so I have to live with each day with the shame, hurt and guilt.

And although the trial is over, the regret and painful memories will remain with me. Just that's sometimes—that's just things I can't shake.

Whitaker's counsel emphasized the theme again in their closing statement in mitigation:

It's no defense to what happened here. It's no defense to what we saw, that he said he did it. It's no excuse or justification.

But the fact that he said he did it, the fact that he showed remorse, the fact that he waived his Fifth Amendment right and agreed that he did it, the fact that he didn't want to turn this into a circus, the fact that he sent the police to find more evidence against him, that's mitigation * * *.

**{¶ 254}** Whitaker's acceptance of responsibility was therefore a major approach to his defense throughout the proceedings before the trial court. The jurors were asked to consider evidence supporting that theme—for example, evidence that he accepted responsibility for his actions even on the day he was arrested by cooperating with the officers investigating the case. Whitaker's plea offer clearly supported the argument that he accepted responsibility; the offer was therefore relevant to mitigation and should have been admitted.

**{¶ 255}** Decisions from other jurisdictions support this view. *See United States v. Fell*, 372 F.Supp.2d 773, 784-785 (D.Vt.2005) (holding that the defendant's willingness to enter into a plea of guilty was evidence of the defendant's state of mind and should be presented to the jury); *Johnson v. United States*, 860 F.Supp.2d 663, 903 (N.D.Iowa 2012) (reaching the same conclusion and stating that a defendant's offer to plead guilty "does have some bearing on the

defendant's character and, more specifically, on the defendant's acceptance of responsibility for the charged offense"); *Busso-Estopellan v. Mroz*, 238 Ariz. 553, 554, 364 P.3d 472 (2015) (the defendant's "pretrial offer to plead guilty is relevant because it tends to make his acceptance of responsibility for the murders more probable").

**{¶ 256}** In reaching a contrary conclusion, the majority relies primarily on two prior decisions of this court, *Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, and *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034. In *Dixon*, we rejected a similar argument made by the defendant in that case, Archie Dixon, stating that "a defendant's offer to plead guilty, never accepted by the prosecutor, is not relevant to the issue of whether the defendant should be sentenced to death." *Id.* at ¶ 69. We then cited *Dixon* to reject the same argument in *Sowell*, *id.* at ¶ 129-130.

**{¶ 257}** I do not believe that the holding in *Dixon* is meant to be broadly applied. First, the decision provided no reasoning or discussion about whether a defendant's plea offer bears on his acceptance of responsibility or, more generally, whether it should be properly considered in a capital case. Neither did the decision in *Sowell*. In *Dixon*, we cited two prior decisions in which we held that a similar plea offer *made by the prosecution* was not relevant mitigation evidence. *See State v. Sneed*, 63 Ohio St.3d 3, 16-17, 584 N.E.2d 1160 (1992); *State v. Webb*, 70 Ohio St.3d 325, 335-336, 638 N.E.2d 1023 (1994). *Dixon* does not create a blanket rule that a *defendant's* plea offer can never be relevant—there is just no discussion in *Dixon* to that effect.

**{¶ 258}** Importantly, just three months after *Dixon* was decided, we reached the opposite conclusion in reviewing the appeal of Dixon's codefendant, Timothy Hoffner. *See State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48. In our independent sentence evaluation in *Hoffner*, we *considered* Hoffner's "offer to plead guilty to the charges in exchange for the prosecutor's dismissing the

death penalty specifications," holding that under the catchall provision of R.C. 2929.04(B)(7), it *was* mitigating evidence. *Hoffner* at ¶ 117.

{¶ 259} The inconsistency between these two cases is a plain indication that the decisions were based on the particular facts before the court. The fact that *Dixon* and *Hoffner* involved codefendants and were decided just three months apart strengthens that conclusion.

{¶ 260} The facts of the present case make it distinguishable from *Dixon*. As previously explained, Whitaker's acceptance of responsibility was a central theme of his case from voir dire through sentencing. The fact that he offered to plead guilty makes it more likely than not—as Evid.R. 401 requires for the admission of relevant evidence—that he did, in fact, accept responsibility for his crimes.

{¶ 261} The majority categorically rejects the idea that an offer to plead guilty can show acceptance of responsibility, at least when the offer is conditioned on the state agreeing not to pursue the death penalty. But the case cited by the majority, *Owens v. Guida*, 549 F.3d 399, 419 (6th Cir.2008), does not provide the requisite support for that rationale. In *Owens*, the court found that the defendant's offer to plead guilty was not relevant to her acceptance of responsibility as a mitigating factor, because the offer was conditional. But the defendant's other statements supported the inference that her plea offer was made only to avoid the death penalty, not because she actually accepted responsibility for her actions: "She did not offer any other evidence of acceptance of responsibility or, as the district court noted, take the stand to express remorse or contrition in hopes of mitigating her sentence * * * to the jury directly" even though she could have done so," *id.*, quoting *Owens v. Guida*, W.D.Tenn. No. 2:00-2765-BR, 2006 WL 1579580, *8 (May 31, 2006). As explained earlier in this opinion, the exact opposite occurred here. *Owens* actually supports the idea that the decision whether a plea offer is relevant to the factors in R.C. 2929.04(B) should be left to the trial judge on a case-

by-case basis.

{¶ 262} Finally, the fact that a defendant's plea offer was conditioned on the state's agreeing not to pursue the death penalty is better understood and explained as affecting the strength of the evidence, not its relevance. In *Hoffner*, for example, we gave "only minimal weight" to Hoffner's plea offer because "Hoffner knew that the evidence against him was overwhelming." *Id.*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 117. *See also Busso-Estopellan*, 238 Ariz. at 554, 364 P.3d 472 ("We are persuaded that the condition (the imposition of a life sentence) on [the defendant's] offer to plead guilty affects the weight of the evidence rather than its admissibility"). An *un*conditional plea offer may be viewed as *stronger* evidence of acceptance of a defendant's responsibility than an offer conditioned on avoiding the death penalty. But the question under Evid.R. 401 is whether the offer has "any tendency to make" the defendant's acceptance of responsibility "more probable or less probable," and regardless of whether the plea offer is conditioned on the state not pursuing the death penalty, it can and does. It therefore should have been for the jury to decide how much weight, if any, to give to Whitaker's plea offer. *See State v. Fox*, 69 Ohio St.3d 183, 193, 631 N.E.2d 124 (1994) ("The process of weighing mitigating factors, as well as the weight, if any, to assign a given factor is a matter for the discretion of the individual decisionmaker").

{¶ 263} I would find that the trial court erred by refusing to permit the jury to consider the weight and import of Whitaker's plea offer during the trial's mitigation phase. This error may be cured, however, through this court's independent sentence evaluation. *See State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 155. I agree with the majority's holding that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. I would therefore affirm Whitaker's convictions and death sentence. But I have written separately to clarify the import of an offer to plead guilty in a death-

penalty matter with reference to evidence of mitigation.

{¶ 264} For these reasons, I concur.

———————————

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Katherine E. Mullin and Mahmoud Awadallah, Assistant Prosecuting Attorneys, for appellee.

Cullen Sweeney, Cuyahoga County Public Defender, and Jeffrey M. Gamso and Erika B. Cunliffe, Assistant Public Defenders, for appellant.

———————————